Jesse Earl McCORMACK,
Plaintiff-Appellee,

v.

NOBLE DRILLING CORPORATION,
Defendant-Appellant,

Chevron Oil Company,
Defendant-Appellant,

Employers Mutual Liability Insurance Company, Intervenor-Appellee.

No. 77–2606.

United States Court of Appeals,
Fifth Circuit.

Dec. 12, 1979.

---

Christopher Tompkins, New Orleans, La., for Noble.

Lloyd C. Melancon, New Orleans, La., for Chevron.

Robert Morlas Schoenfeld, Wood Brown, III, New Orleans, La., for plaintiff-appellee.

Before SIMPSON, CHARLES CLARK and FRANK M. JOHNSON, Jr., Circuit Judges.

FRANK M. JOHNSON, Jr., Circuit Judge:

Jesse McCormack was severely injured in the course of his employment on a submersible barge oil drilling rig in the Gulf of Mexico. A jury in the United States District Court for the Eastern District of Louisiana found defendants Chevron Oil Company[1] and Noble Drilling Corporation negligent and found that the negligence was a proximate cause of McCormack's injuries. McCormack's damages were set at $470,000 but, because the jury placed twenty percent of the fault for the accident with McCormack, the district court entered judgment for $376,000. Chevron and Noble appeal.

## I. FACTS

In its exploration for oil off the Louisiana coast, Chevron contracted with Noble for the drilling of an oil well. Under the contract, Noble conducted the drilling operation aboard S–55, a submersible barge owned by Chevron. One of the final steps in the drilling operation is the installation of metal casing in the well hole. For the casing procedure, Chevron contracted with Sladco, McCormack's employer.

On the S–55 McCormack ran a large hydraulically powered wrench called "power tongs" which, because of its size, is suspended from the oil derrick. As lengths of metal casing were fit together to be lowered into the well hole, McCormack placed the jaws of the tongs around the pipe and the machine tightly screwed the pieces together. Because of the great torque generated by the tongs, it is necessary to anchor the wrench itself so that the machine cannot spin freely around the pipe and injure the operator. The "snub line," a metal cable attached to a stationary object, provides the necessary anchor.

On May 24, 1973, drilling activity aboard the S–55 ceased while the workers awaited the arrival of a set of power tongs to re-

place a pair that had broken down earlier. When the replacement tongs arrived Kenton Boudreaux, McCormack's relief operator and the only other Sladco employee on the barge, rigged the tongs and operated them without difficulty. The very first time McCormack ran the tool, however, something went wrong and McCormack was seriously injured.

## II. SUFFICIENCY OF THE EVIDENCE

Defendants' major claim on appeal[2] is that the evidence adduced at trial was insufficient as a matter of law to generate a factual question regarding the negligence of either Noble or Chevron. Defendants also contend that plaintiff's injuries were caused by malfunction of the tongs and the negligence of Sladco and McCormack rather than by acts or omissions of Noble and Chevron. They argue that the district court erred in not granting their motions for directed verdict and for judgment notwithstanding the verdict.

The standard of review for questions concerning sufficiency of the evidence is firmly established in this Circuit.

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the

---

1. Now Chevron U.S.A., Inc.

2. Among the contentions raised by Noble and Chevron in brief was the contention that the Louisiana contributory negligence doctrine should preclude plaintiff McCormack's recovery. At oral argument, however, it was con-

ceded that, because McCormack's accident occurred aboard a vessel, the admiralty rule of comparative negligence governs the case. *See* G. Gilmore & C. Black, Law of Admiralty, 500 n.70 (2d ed. 1975).

case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*Boeing Co. v. Shipman*, 411 F.2d 365, 374–75 (5th Cir. 1969) (en banc) (footnote omitted); *see King v. Ford Motor Co.*, 597 F.2d 436, 439 (5th Cir. 1979); *Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373, 1382–83 (5th Cir. 1979); *Pearce v. Witchita County*, 590 F.2d 128, 132–33 (5th Cir. 1979).

■ In light of the *Boeing* standard, we hold the evidence regarding causation and Noble's negligence sufficient to support the jury's verdict. As to Chevron, however, we find error in the district court's refusal to grant the motions for directed verdict and for judgment notwithstanding the verdict.

### A. *Noble*

Noble's intimate involvement in the casing operation is undisputed. The lengths of two and three-eights inch diameter casing tubing were stored on the S–55 on a pipe rack next to the derrick. By means of a crane-like device, Noble employees hoisted pieces of the tubing into the derrick where the "stabber," also a Noble employee, took control of them. The stabber stood on the "monkey" or stabbing board above the floor of the rig and, as lengths of pipe came to him, unhooked them and stabbed the male end of the tube into the box end of the last length of pipe in the string already extending into the well hole. The stabber then began to thread the pipes together to en-

sure that the connection was started straight. At that point under the procedure employed by Noble and Sladco on the S–55, Sladco's tong operator attached the jaws of the tongs to the joint and applied light torque sufficient to permit the connection to be tested for leakage through the use of a device known as a "gator hawk."[3] While the Sladco tong operator put light torque on the connection, the stabber steadied the upper end of the pipe with his hands. After the gator hawk operator checked the joint, with the stabber still holding the pipe, heavy torque of the tongs finished the connection. Then the stabber fastened the "elevators" to the top of the pipe and lowered it into the well where it was locked into place. The whole procedure was then repeated with the next length of casing.

At trial there was testimony that if the cable of the snub line is too long the tongs will rotate too far around the casing and the operator may be trapped by the snub line and seriously injured. McCormack was hurt when the tongs rotated too far and, at his deposition, he stated that he believed the cause of his accident was the improper length of the snub line. Kenton Boudreaux, however, testified that when he rigged the replacement tongs he used the snub line that had been attached to the tongs that had broken down earlier and that he did not alter the length of the cable. Moreover, Boudreaux stated that, when he checked the operation of the new tongs, the length of the snub line was correct. At trial other witnesses, all Noble employees, also testified that the snub line appeared to be the proper length.

At trial McCormack's theory of the cause of his injuries was that under the power of the tongs the tubing bent toward the snub line even though the snub line was correctly rigged. As a result of the bending of the pipe, the length of the cable was in effect increased greatly. The tongs rotated about

---

**3.** As with Noble and Sladco, the company testing the pipe joints was an independent contractor.

the pipe, trapped Jesse McCormack in the snub line, and seriously injured him.[4]

Defendants attempted to explain the bending of the pipe in terms of McCormack's negligence or malfunction of the tongs. Noble employees testified that they heard the machine "run away" at full throttle although the tongs were supposed to apply only light torque at the stage of operation then being performed. Further, witnesses stated that McCormack's hand was still on the throttle when he was extricated from the tangle of pipe, tongs, and snub line. Evidence presented to the jury, however, also supports the theory that the tongs did not malfunction. Kenton Boudreaux operated them with no difficulty before the accident and Sladco's repair records clearly indicate that, although shortly after the accident Sladco checked the tongs McCormack had used when he was hurt, the machine needed no repair. Indeed, for a full year following the accident no repairs were made on the tongs that related in any way to the alleged malfunction.

Plaintiff, plaintiff's expert, and Noble employees all testified that they were aware of other instances in which casing tubing had bent. McCormack relies on the knowledge that casing tubing is fragile to argue that, because the procedure used by Noble permitted the pipe to bend despite the availability of a method that easily could have prevented McCormack's injuries, Noble did not conduct its operation in a reasonably safe manner.[5]

As stated above, during the entire procedure of making the connection between the two lengths of casing, the tubing was secured only at the floor of the rig. The only

stability above the tongs resulted from the stabber holding the top of the tubing in his hands. Witnesses agreed that the method used by Noble in running the tubing was one of two generally employed in the industry. Under the procedure not used by Noble, the elevators that lower tubing into the well hole[6] help secure the top of the tubing. In following that method, after light torque is applied to the connection and while the gator hawk operator tests the connection, the elevators are lowered over the top of the pipe before the joint is finally tightened with high torque. The weight of the elevators and the assembly to which they are attached would greatly lessen the likelihood of the pipe bending under the torque from the tongs, even if the elevators are placed over the end of the pipe but not engaged.[7] Plaintiff's expert testified that the accident would have been "very unlikely" had the elevators been over the top of the casing when McCormack applied torque.

Noble argues, however, that since, during the attempted connection when McCormack was injured, there was no pause between the light and heavy torque that afforded time in which to put the elevators on the pipe, under neither of the generally accepted procedures can it be deemed negligent. This contention, however, ignores portions of the testimony of plaintiff's expert.

According to plaintiff's expert, the stabber could have started the first few threads of the connection and then placed the elevators loosely over the end of the pipe before McCormack applied any torque from the tongs. This method was not a commonly accepted procedure, however, because on the S–55 Noble and Sladco were

---

4. Exhibits at trial clearly indicated that the tubing to which the tongs were attached bent as much as twenty degrees from the vertical.

5. The court properly instructed the jury that the standard to be used in deciding whether defendants were negligent depended upon whether the method employed at the time of McCormack's injury "was in fact reasonably safe."

6. The elevators are part of an assembly that includes several components and weighs over ten tons. When not engaged they fit loosely

over the end of the casing like a large doughnut. When raising or lowering the tubing, however, the elevators clamp down over the pipe and would prevent it from rotating freely to connect the two lengths of casing. Nevertheless, the elevators could be engaged for the heavy torque.

7. Although the elevator assembly is free-swinging, its twenty thousand pound weight would add considerable stability to a length of casing fastened securely only at the bottom.

running a "dual string" of casing into the well. In order to do this, connections are made on both lines before the elevators are placed over the pipes to lower them into the hole. McCormack used "special clearance" tongs when he was injured, tongs that could fit between the two lengths of pipe extending into the well. The gator hawk being used to test the connections, however, was too large unless the strings of pipe were manually spread apart. With the elevators on, this would not be possible. Nevertheless, the expert testified that in his opinion the operation would have been safer had the elevators been hooked up before any torque was applied, taken off to permit testing the connections, and then reattached for the final torque before the pipes were lowered into the hole. In the expert's view, the cost of this procedure over those commonly employed would only be some lost time—about six minutes per hour. Considering all the evidence, the jury properly could have concluded that Noble's method of operating constituted negligence that was a substantial factor leading to McCormack's injury.[8]

### B. *Chevron*

Although we find the jury properly could have concluded that Noble breached its duty to conduct its operations in a reasonably safe manner, with regard to defendant Chevron we hold the evidence insufficient

under the *Boeing* standard discussed above. Accordingly, we reverse the judgment against Chevron.

Forrest Strickland served as Chevron's representative aboard the S–55. Strickland testified that his responsibility involved mainly "walk[ing] around checking on [the work], making sure that it is done and that the end result is that we get an oil well." Strickland evidenced no responsibility for and no knowledge of the specific procedures for running casing employed by Noble and Sladco at the time of McCormack's accident. Further, when asked about the safest method for conducting the casing operation, Strickland stated that he "couldn't say. I am not an authority on the individual steps."

 It is clear that Chevron exercised no control over the manner in which Sladco and Noble conducted their operations. In such cases, the general rule against the vicarious liability of an employer for the acts or omissions of independent contractors is not overcome. *See Jeter v. St. Regis Paper Co.*, 507 F.2d 973, 977–78 (5th Cir. 1975); *Castel v. Moller, A. P.*, 441 F.Supp. 851, 853 (N.D.Cal.1977); *Ramsey v. Georgia-Pac. Corp.*, 597 F.2d 890, 892–93 (5th Cir. 1979); *Horn v. C. L. Osborn Contracting Co.*, 591 F.2d 318, 320 (5th Cir. 1979); W. Prosser, Law of Torts § 70 at 481–82 (3rd ed. 1964); Restatement (Second) of

---

8. On the issue of whether Noble's procedure was necessarily reasonably safe because the industry commonly ran casing in the same manner, the court instructed the jury as follows:

> The fact that a defendant conducted its operations in a manner similar to [that] used by other companies is relevant to your consideration of its negligence, but that fact is not conclusive as to whether or not [the defendant] was guilty of negligence . . . .
> [I]t remains for you to determine, from all of the evidence, whether the method being used at the time of plaintiff's injury was in fact reasonably safe.

The court's instruction was proper. "[W]hat ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." *Texas & Pac. Ry. v. Behymer*, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905 (1903); *see B & B Insulation, Inc. v. Occupational Safety & Health Review Comm'n*, 583

F.2d 1364, 1370 (5th Cir. 1978); W. Prosser, Law of Torts § 33 at 168–69 (3rd ed. 1964); Restatement (Second) of Torts § 295A, comment c (1965).

> No group of individuals and no industry or trade can be permitted, by adopting careless and slipshod methods to save time, effort, or money, to set its own uncontrolled standard at the expense of the rest of the community. If the only test is to be what has always been done, no one will ever have any great incentive to make any progress in the direction of safety. It follows, therefore, that whenever the particular circumstances, the risk, or other elements in the case are such that a reasonable man would not conform to the custom, the actor may be found negligent in conforming to it; and whenever a reasonable man would depart from the custom, the actor may be found not to be negligent in so departing.

*Id.*

Torts § 409, § 414, comment c at 388 (1965).[9] Chevron owed no duty to ensure that Noble and Sladco performed their obligations in a reasonably safe manner, *see Blackwell v. Cities Service Oil Co.*, 532 F.2d 1006, 1007 (5th Cir. 1976); *Gray v. Martindale Lumber Co.*, 527 F.2d 1352, 1355 (5th Cir. 1976), and absent a "peculiar unreasonable risk of physical harm," Restatement (Second) of Torts § 413 (1965), not here present, Chevron owed no duty to take special precautions. *Id.; see Horn v. C. L. Osborn Contracting Co., supra*, 591 F.2d at 320; *Blackwell v. Cities Service Oil Co., supra*, 532 F.2d at 1007.

### III. OTHER CONTENTIONS

#### A. *Contribution from Compensation Insurer*

In brief defendants argue that under the Equitable Credit or Murray Credit doctrine they are entitled to contribution from plaintiff's employer Sladco for its negligence in causing McCormack's injuries. Defendants claimed the district court erred in refusing to submit the issue of Sladco's negligence to the jury. At oral argument, however, it was conceded that under the 1972 amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 905, *et seq.*, the Supreme Court's decision in *Edmonds v. Compagnie Generale Transatlantique*, —— U.S. ——, ——, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), bars such contribution. Nevertheless, Noble contends that because Employers, Sladco's compensation insurer, intervened and prosecuted plaintiff's case, the company waived any immunity it may have enjoyed. The argument has no merit.

#### B. *Substitution of Alternate Juror*

Noble also argues that the trial court abused its discretion in excusing one juror and substituting an alternate at the close of evidence. The contention is frivolous. In the present circumstances the substitution was made by the trial judge for sound reasons and therefore there was no abuse of discretion in making the substitution.

#### C. *Prejudgment Interest*

Noble admits that the decision to award prejudgment interests lies within the discretion of the trial court but argues that in a close case in which the plaintiff is also found negligent such an award constitutes an abuse of discretion. In admiralty, prejudgment interest is the rule rather than the exception. *In re M/V Vulcan*, 553 F.2d 489, 490 (5th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977). The contention merits no further discussion.

AFFIRMED in part,

REVERSED in part.

---

9. c. In order for the [employer to be subject to liability for negligent exercise of control over the independent contractor], the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.
*Id.* § 414, comment c at 388.