Herman J. DOUCET, Plaintiff-Appellee,

v.

DIAMOND M DRILLING COMPANY, Defendant-Appellant.

No. 80-3796.

United States Court of Appeals, Fifth Circuit.

Aug. 23, 1982.

Rehearing and Rehearing En Banc Denied Sept. 22, 1982.

---

McLoughlin, Barranger, Provosty & Melancon, Lloyd C. Melancon, New Orleans, La., for defendant-appellant.

Young & Burson, Ltd., I. Jackson Burson, Jr., Joseph Bradley Ortego, Eunice, La., for plaintiff-appellee.

Before COLEMAN, POLITZ and GARWOOD, Circuit Judges.

COLEMAN, Circuit Judge.

Herman J. Doucet injured his back while working as a pusher for an oil well casing crew on a submersible drilling barge in the Gulf of Mexico, twenty miles off the Louisiana shore. Upon suit brought under 33 U.S.C., § 905(b),[1] a jury in the Western District of Louisiana absolved Chevron U.S.A., Inc. of negligence and found that Diamond M Drilling Company was guilty of negligence proximately causing Doucet's injuries. His damages were assessed at $600,-000, reduced by ten percent for his contributory fault. Judgment was entered for $540,000, less $65,213.64 awarded American Home Assurance Company as the intervening Diamond M compensation carrier. Diamond M appeals. We reverse.

As operator, Chevron U.S.A., Inc., contracted with Diamond M for the drilling of the oil well, off the coast of Louisiana. Diamond M supplied the submersible drilling barge EPOCH, the drilling crews, and the roustabout crews. Chevron contracted with Offshore Casing Crews, Inc., Doucet's employer, for the oil well casing operations which were to be prosecuted on board the vessel.

April 21, 1977, aboard the EPOCH, Doucet was the foreman (pusher) of the five man casing crew employed by and working for Offshore, executing the casing contract for Chevron. The casing crew was working in conjunction with the roustabouts employed by the vessel. Doucet had five years experience as a pusher, and had worked on many similar jobs, which usually ran five to ten to twenty-four hours, depending upon weather and other conditions.

Beginning at approximately 11:30 P.M., the casing crew spent an hour and a half getting the casing equipment ready to go. A trolley line was rigged from the drill floor to the pipe rack. At Chevron's direction, Doucet's crew had brought five rubber thread protectors aboard the EPOCH. They were to replace the metal thread protectors originally attached to the end of each pipe joint to protect the threads from damage while being moved about from place to place. The casing crew showed the Diamond M roustabouts how to replace the metal protectors with the rubber ones before sending the pipe along to the platform. As a matter of fact, the casing crew removed the first five metal protectors and put on the rubber ones while the joints lay on the pipe rack. The casing crew then returned to the rig floor and began operations.

When the pipe is taken from the pipe rack and arrives at the point where it is to be set in the drilling hole the rubber protector is unsnapped and sent back down the trolley to be used on the succeeding joints.

In six to seven years work in casing operations, Doucet was experienced in taking off both metal and rubber pipe thread protectors and had worked with metal protectors on approximately half of the jobs he had been on. The casing pipe joints were hoisted from the pipe rack onto the drilling floor by the draw works which were operated by the driller, a Diamond M employee. Doucet would unsnap the rubber protectors from the joints and guide the joints into the drill hole. After running about an hour of casing (twenty to twenty-five lengths),

---

1. The statute in question, § 905(b), provides:

 In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof may bring an action against such vessel as a third party in accordance with the provisions of § 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence

 of persons engaged in providing stevedoring services to the vessel. If such person was employed by the vessel to provide shipbuilding or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing shipbuilding or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

Doucet noticed that a drilling floor worker was unable to remove a metal protector. Intending to remove the metal protector, Doucet picked up a 36 inch pipe wrench and placed it around the protector. Upon applying the wrench Doucet says he realized that the pipe was hanging too low, that is, about 2½ feet off the drilling floor (Doucet was only 5½ feet tall) so he "hollered to" the driller, a Diamond M employee, to "raise the joint a little". Hand signals are often used in such a situation but Doucet was holding the wrench with both hands and in that position could not give a hand signal. The driller was somewhere between ten and twenty feet away. At trial, the driller did not recall the incident, but testified that such a verbal request if given and heard would have been complied with as a matter of course. For whatever reason, the joint remained below waist level and Doucet did not repeat his request, he did not wait on a lift, and there is no evidence that he asked for the assistance of a welder to cut off the metal protector with a blow torch. Instead, he energetically jerked on the metal protector six or seven times and then felt a hard pain in his back. This took place around 2 A.M. on April 22, 1977, and that is what this litigation is about.

After the incident, Doucet quit working because of the pain in his back but remained aboard the EPOCH until the job was completed. For eight or ten days afterward he did not go to a doctor. He had had two back injuries prior to this one. Fourteen years previously he had fractured three vertebrae and was unable to work for six weeks. The second injury occurred about 1975 when Doucet pulled a muscle in his back and missed three to four weeks of work. Doctors were of the opinion that because of his back condition Doucet could not permanently return to heavy manual work, such as that of a longshoreman or roughneck. His fourth grade education substantially restricted his possibilities of finding sedentary work. An expert testified that the injuries caused a loss of $561,-385.80 in future wages and this testimony was not contradicted.

At trial, Doucet asserted that Diamond M was negligent in that it had failed to replace the metal protector with a rubber one, and in failing to raise the casing pipe "a little higher" when requested to do so.

Diamond M claims that *as a matter of law* the evidence was insufficient to generate a factual issue regarding its alleged negligence; therefore, the District Court erred in not granting its motions for directed verdict, for judgment notwithstanding the verdict, or for a new trial. Alternatively, it is said that the trial judge abused his discretion in failing to order a remittitur or a new trial on the issue of damages. Diamond M argues that it owed no legal duty to Doucet to remove the protector or to raise it, and if such a duty did exist any breach thereof was not the legal cause of Doucet's injury. Finally, it argues that Doucet's disregard for his own safety was the sole legal cause of his injury.

 As to activity on a submersible barge oil drilling rig in the Gulf of Mexico, this case is very similar to that decided by this Court in *McCormack v. Noble Drilling Corporation*, 608 F.2d 169 (5th Cir. 1979). There, the standard of review for the sufficiency of the evidence in such cases was announced as "firmly established", to-wit, that of *Boeing Company v. Shipman*, 411 F.2d 365, 374, 375 (5th Cir., 1969) (en banc).[2]

---

2. On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be grant-

## I

This is a case in which both the vessel and the longshoremen employed by the independent contractor, Offshore, were working concurrently on the same operation. In these circumstances the vessel would be liable if it negligently injured the longshoreman or if it failed to exercise reasonable care under the circumstances to avoid exposing him to harm from hazards he might encounter from causes under the active control of the vessel, *Scindia Steam Navigation Company, Ltd. v. De Los Santos*, 451 U.S. 156, 167, 101 S.Ct. 1614, 1622, 68 L.Ed.2d 1 (1981). *Scindia* says that "Congress intended to make the vessel answerable for its own negligence", 101 S.Ct. at 1622.[3] We think *Scindia* means that in the case now before us the decisive issue is whether the evidence could justify a finding by a reasonably minded jury that Diamond M negligently exposed Doucet to a hazard which it knew, or in the exercise of reasonable care under the circumstances should have known, would proximately cause his injury.

## II

We have analyzed and reanalyzed the record in this case to see whether Doucet offered enough evidence to meet the *Scindia* test. Our task has not been made any easier by the fact that Diamond M was so confident of its position that it offered no testimony of its own. Even so, we find ourselves unable to avoid the firm conviction under *Boeing* standards that Doucet must lose this appeal.

We first consider the failure of the Diamond M roustabouts to remove the metal protector from the length of pipe on which Doucet hurt himself and their corresponding failure to install the rubber protector before sending the pipe to the drilling floor.

The evidence is clear that Chevron had directed that the metal protectors be replaced with the rubber protectors, had furnished them for that purpose, and Doucet had brought them aboard. As a general proposition, it is clear that the Diamond M crew had agreed to use them but there was no testimony from anybody on the drilling platform, from Doucet or anybody else, that it had been understood that the roustabouts would remove stuck or "tight" metal protectors before sending them up. Many forty foot sections of 13⅜ inch pipe had previously come up with the rubber protectors and had been installed without complication. From Doucet's testimony it appears that there had been between twenty and twenty-five of these sections. There was testimony from at least two of Doucet's witnesses that the metal protectors had been cross threaded. None of the litigants called any of the roustabouts as witnesses in search of an explanation for sending up this section of pipe without the metal protector. We think the jury could reasonably infer from the evidence that the roustabouts found it either difficult or impossible to remove the metal protector, so they simply sent it to the drilling floor where the casing crew would have to deal with it, but neither the pipe section nor the metal thread protector injured Doucet. The pipe did not fall on him or strike him. He hurt himself while attempting to remove the metal protector.

Therefore, the decisive issue becomes: Did the evidence in a manner that could have been accepted by a reasonably minded jury show by a preponderance of the evidence that the Diamond M roustabouts negligently exposed Doucet to a hazard which they knew, or in the exercise of "reasonable care under the circumstances" should have known, would put him to the hazard of personal injury?

---

ed only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses (Footnote omitted).

**3.** The defense of assumption of risk is unavailable in § 905(b) litigation. Diamond M may not defend on the ground that Doucet should have refused to proceed until the rubber protector had been installed. *Scindia*, 101 S.Ct. at 1626, note 22.

Doucet had only a fourth grade education but upon reading his testimony one is impressed by his ability to respond to questions clearly, logically, and succinctly. Doucet did not say that sending the pipe up with a metal thread protector was unsafe or that it presented him with an unusual or an unexpected hazard. He complained only that he got hurt because the driller had not raised it a little higher when asked to do so. Doucet testified (Tr. 260) that he had previously used Stillson wrenches to loosen stuck metal protectors, that it was not an uncommon practice, that over half the jobs on which he had worked used metal protectors. He said that sometimes the metal protectors can be taken off by hand, sometimes with a wrench, and sometimes they had to be burned off by a welder, that burning them off was not unusual.

At page 263 of the transcript we find the following:

Q. Was there any way that you could tell whether or not that steel protector would come off easily with the pipe wrench until you pulled on it?

A. (By Mr. Doucet) No, no, that happened many times where we had to put the wrench on. Sometimes they come off easy with the wrench, sometimes you got trouble.

We conclude that there was no evidence, directly or by inference, that sending the pipe up with the metal protector was unusual or presented a foreseeable hazard of personal injury to an experienced casing crew pusher, as Mr. Doucet undoubtedly was.

On the other hand, there was much testimony from many sources (all of it adduced on behalf of Mr. Doucet) that the chief function of the rubber thread protector is to expedite the casing work; that the protectors are not used to improve the safety of the operation; and in 25% of the cases metal protectors will have to be *cut off* before using the pipe.

However, Doucet presented the testimony of Paul Montgomery, a petroleum engineer, testifying as an expert, who said that 60% of his current income came from supplying expert testimony in court for parties plaintiff and defendant. He had never seen or inspected the Diamond M drilling rig.

At page 327 of the transcript he testified that he liked "to use quickie (rubber) protectors [●] *not from a safety consideration, but for other considerations*" (emphasis added).

Mr. Montgomery was then asked to state the reasons for using the rubber protectors. He responded (Tr. 328):

A. First off, I would like to take the metal protectors off the pipe while its on the racks and it gives you an opportunity to look at the threads and possibly eliminate a problem that you might have later on while you are actually running the casing. Also, if necessary, you can clean the threads then put the metal protectors back on just hand tight and since you only have a limited supply of quickie protectors, you put them on just before you take the pipe up onto the rig floor to be run. It saves a great deal of time for the casing crew and speeds up the operation in my experience to use quickie protectors.

At page 336, we see the following testimony from Mr. Montgomery:

Q. Have you ever had any experience where rubber protectors had been ordered and were present on the job when they weren't used and the metal protectors were used instead?

A. I have had occasions where we had rubber protectors and we were using them where a joint occasionally would come up on the floor with the steel protectors still on it because it was cross threaded, because they had not been able to get it off on the pipe rack, but that is the exception rather than the rule.

Q. And in those cases, how would you normally take it off?

A. Start with a sledge hammer, if it's cross threaded and try to get it back even or level if at all possible and the next thing that I would think about

doing would be to weld a lug, a nut or something of the sort on the side of the protector and using the hammer some more. Generally, that will get it off short of cutting the protector.

Finally, (Tr. 337) Mr. Montgomery testified:

Q. In this particular case, do you have an opinion as to whether the failure to remove the metal protector on the pipe rack and to replace it with a rubber protector made that casing operation unsafe at that time?

A. Yes, I think it should have been removed on the pipe rack.

This one answer is the sole and only evidence in this record upon which a jury could rely in finding, if it did so find, that sending up the pipe with the metal protector amounted to actionable negligence. Yet, Mr. Montgomery stated at the very beginning of his testimony that the use of rubber protectors was NOT FOR SAFETY REASONS but for other reasons.

 Mr. Doucet had the burden of establishing actionable negligence by a preponderance of the evidence under *Scindia* standards and that burden simply could not be met by the self contradictory testimony of a single witness, especially when that statement is balanced against all the other uncontradicted evidence in this record[4] and heretofore set forth in this opinion. This is most cogently so because Mr. Doucet testified (Tr. 196) as follows:

Q. What is the purpose of these rubber protectors? What good do they do you on the job?

A. Try to protect the threads on the joint and faster—makes it a faster job.

### III

 This means, of course, that Mr. Doucet's recovery must stand or fall on that theory of the case which he developed in his own testimony, which may fairly be stated, as follows: Diamond M's driller in charge of the pipe lift saw that Doucet was trying to remove a metal thread protector and when requested to lift the pipe a little higher (to an arguably more safe position) he neglected to do so, thus contributing to the injuries to the crew leader's back.

We begin our analysis of this aspect of the case by looking first to Mr. Doucet's testimony.

Q. When that joint came up with the metal protector on, did you ask the driller to do anything?

A. While I was taking it off?

Q. Yes, sir.

A. While I was jerking on it?

Q. Yes, sir.

A. Yeah, I asked him to pick it up a little.

Q. Did he do it?

A. No.

(Tr. 201).

At a later point, (Tr. 202):

"I went and got me a 36 inch pipe wrench and I put it on and I—when I first put it on I realized that my pipe was too low so I looked at the driller and I hollered at him—I couldn't make any signs with my hands—both my hands were tied up and I hollered at him to pick up a little and he didn't so I started jerking on it."

At a later point, (Tr. 238):

Q. Now, when you told him that, was Mr. Buchan (the driller) looking at you?

A. Yes, sir.

Q. What did he do?

A. Nothing.

Q. Did he say anything back to you?

A. No.

---

4. The Court is aware of the rule that operations in a manner similar to that used by other companies is relevant but not conclusive as to a defendant's negligence, *McCormack v. Noble Drilling Corporation*, 608 F.2d 169 (5th Cir., 1979). The ultimate issue is whether the defendant negligently used a procedure which it knew, or in the exercise of due care should have known, was unsafe.

Q. When Mr. Buchan didn't respond to that "pick up the pipe a little", you then went on ahead and pulled on it anyhow, sir?

A. Jerked on it, yeah.

The members of Mr. Doucet's crew were Terry Meche, Emery Richard, Dale Briscoe, and Glenn Bourgeois.

Terry Meche saw the episode from forty five feet up in the tower. Introduced as a witness for the plaintiff he said nothing about hearing Doucet "holler" at Buchan, the driller, so it must be assumed that the "holler" could not be heard at a distance of forty five feet. He said Buchan was situated between twenty and twenty five feet from where Doucet was using the wrench. Did Buchan hear the holler, or should he have heard it if he had been paying attention to his business? We must assume that he was paying attention because Doucet testified that Buchan was looking at him at the time.

When Buchan was put on the witness stand he had no memory of the incident, so he could shed no light on it whatever.

Emery Richard testified that he was a floor hand on Doucet's crew, operating the tongs. He was standing on a platform five or six feet high located five or six feet from Doucet, between Doucet and the driller and the driller was on the floor only five or six feet from Richard. Richard said he heard Doucet ask the driller "to kind of pick up a little higher". He never saw Doucet use hand signals at any time but Doucet testified that he used hand signals at all times when he did not have his hands on the wrench.

Dale Briscoe worked the V-door. He said he saw the injury take place but also said that it took place in the daytime, the sun was out, whereas Doucet and Richard testified that it took place at 2 A.M. He was eight feet from Doucet. He gave no testimony concerning Mr. Doucet hollering to Buchan to raise the pipe.

Glenn Bourgeois was called as a witness by Doucet. He was on a stand three feet high, handling the mud and joining the pipes. He said that rubber protectors were used because they made the job go faster and smoother. He was not looking at Doucet when he got hurt. He thought Doucet was not over ten feet from the driller. He said the injury occurred *in the morning, before lunch.* He said Doucet gave a hand signal for Buchan to raise the pipe. Then (Tr. 155) Bourgeois said that the casing crew used hand signals most of the time "because a rig is very noisy, you have to scream to the top of your head to make him understand you".

In this mass of inconsistent, sometimes contradictory, testimony, all adduced by Doucet in support of his claim, could a reasonably minded jury have found by a preponderance of the evidence that the driller, Buchan, *heard* and *ignored* the "hollered" request to raise the pipe a little higher?

*Boeing* teaches that on motions for a directed verdict all of the evidence must be considered along with all reasonable inferences most favorable to Doucet. If the facts and inferences point so strongly and overwhelmingly in favor of a particular party that reasonable jurors could not arrive at a contrary verdict the motion may properly be granted. If there was substantial evidence in support of Doucet, such as that might cause reasonable jurors to differ about it, the verdict must be left undisturbed. However, a mere scintilla of evidence is insufficient to present a question for the jury.

The jury had a right to believe Doucet's testimony that he "hollered" at Buchan to raise the pipe. He said Buchan was looking at him, but he took no action. Buchan could have heard Doucet. Did he, in fact, do so? A close examination of the record shows that on this issue the jury was left to rely on speculation and conjecture. His witness said that a drill rig is so noisy that you have to scream at the top of your head to be heard. Inferentially, Doucet concedes this because he said he "hollered". Richard, stationed five or six feet horizontally and the same distance vertically from Doucet says he heard the "holler" but he was sta-

tioned between Doucet and the driller. Two other witnesses, Doucet's witnesses, as close to Doucet as Emery Richard, said nothing about hearing the "holler". Indeed, one of them went so far as to say that he never saw anything but hand signals on this particular job on board the EPOCH and Doucet testified himself that he had used hand signals when not holding the wrench.

Could reasonable jurors differ over whether substantial evidence supported an inference that the driller had heard the "shouted" request and simply failed to honor it?

On this issue, we are left with an abiding conviction that they could not. Therefore, the directed verdict on behalf of Diamond M should have been granted.

The judgment of the District Court is REVERSED.