Gregory Paul ARABIE

v.

CHEVRON U.S.A., INC., et al.

Civ. A. No. 86–3243–O.

United States District Court,
W.D. Louisiana,
Lafayette/Opelousas Division.

June 15, 1988.

---

Fruge' and Dejean, Jack C. Fruge, Lafayette, La., for plaintiff.

Milling, Benson, Woodward, Hillyer, Pierson & Miller, Joseph W. Looney, Marion L. Fagan, New Orleans, La., for Chevron USA and Noble Drilling Co.

McGlinchey, Stafford, Mintz, Cellini, & Lang, Lance S. Ostendorf, New Orleans, La., David L. Barnett, for Nat'l Union Fire Ins. Co. of Pa.

## RULING

NAUMAN S. SCOTT, District Judge.

On May 17, 1988, the second day of trial of this case, we entered a directed verdict in favor of defendants, Chevron U.S.A., Inc. ("Chevron") and Noble Drilling Corporation ("Noble"), pursuant to Rule 50(a) of the Federal Rules of Civil Procedure, dismissing all of plaintiff's claims against defendants with prejudice. We now assign written reasons for our ruling.

FACTS:

Prior to June 29, 1986 plaintiff, Gregory Paul Arabie, was employed as a sales and service technician by Geolograph Pioneer, Inc. ("Geolograph"). Plaintiff's duties included installing, maintaining, and repairing drilling mud and solids-control equipment used in offshore oil and gas drilling operations.

At some time in early June 1986 Chevron leased a centrifuge unitized skid for the treatment of drilling mud from Geolograph pursuant to an Equipment Rental Agreement. It was agreed that Geolograph would provide the equipment and necessary services as an independent contractor. *See* Joint Pretrial Stipulations filed April 18, 1988 (Document No. 86 in the record). Plaintiff was sent by his employer to Chevron's fixed platform, Eugene Island Block 360–A, which is located on the Outer Continental Shelf off the coast of Louisiana. Plaintiff inspected the platform and Noble Drilling Rig No. 24, which was situated on top of the platform, in order to determine where Geolograph's equipment should be installed. Thereafter, plaintiff returned to Chevron's platform on June 17, 1986 to install the centrifuge unitized skid.

On June 27, 1986 plaintiff was sent to Chevron's platform by Geolograph for the third time. On this date plaintiff made repairs to the centrifuge skid; in particular, to the starter mechanism for the bayrite effluent return pump which was part of the skid. After making the necessary repairs, plaintiff remained on the platform overnight to monitor the centrifuge skid at the request of the Chevron Company representative, Robert Duhon. During the fol-

lowing 48 hours other problems developed while the centrifuge skid was in operation. Packing used in the bayrite effluent return pump burned out on two or three separate occasions. On each occasion plaintiff had to shut down the skid unit, close valves controlling the flow of liquids to and from the unit, replace the packing material, and then open the valves to restore flow of liquids and place the unit back in operation. At trial, plaintiff offered that the reason for the repeated malfunctions was because someone, presumably employed by Chevron or Noble, kept closing the valve that controlled water flow to the pump, thus causing the pump shaft to overheat and the packing to bind and burn-out. On the last such occasion, plaintiff was awakened at approximately 3:30 a.m. on June 29 and told that the pump had malfunctioned. Plaintiff found that the housing around the pump had cracked and that drilling mud had escaped from the pump onto the deck in the area immediately surrounding the centrifuge skid. Plaintiff determined that the centrifuge skid should not be operated until the pump could either be repaired or replaced. Plaintiff notified Robert Duhon that the equipment should not be used; however, he took no other steps to prevent the equipment from being placed in operation.[1] Plaintiff returned to the skid unit at approximately 4:30 a.m. and found that it was operating and that the bayrite effluent return pump was "flinging" and "spewing" mud. At that time plaintiff took measures to prevent the pump from being operated and disconnected the various flow lines to and from the pump. When disconnecting these lines a "half gallon or a gallon" of mud escaped onto the deck. At approximately 5:30 a.m. plaintiff telephoned his supervisor onshore and requested that a replacement pump be sent to the platform. Afterwards, plaintiff rested, ate, and watched TV in the rig quarters the remainder of the day while waiting for the replacement pump to arrive.

At approximately 8:30 p.m. on June 29 plaintiff returned to the centrifuge skid in order to remove the damaged pump which weighed between 100 to 150 pounds. Plaintiff observed that drilling mud was present on the deck around the centrifuge skid; however, he decided it did not pose any hazard to his work. Therefore, plaintiff made no effort to wash the deck or to notify anyone with Noble or Chevron so the deck could be cleaned. While standing in the mud, plaintiff attempted to move the pump from its stand and place it elsewhere. Plaintiff testified that while lifting the pump one foot slipped in the mud, but he did not fall. When this happened, he felt immediate pain in his lower back. Shortly afterwards plaintiff went to bed, but got back up again at 12:30 a.m. when the replacement pump arrived at the platform. Although his back was hurting, plaintiff, with the aid of a roustabout, lifted and carried the replacement pump to the centrifuge skid. Once there, plaintiff used a cheater pipe and wrench to disconnect a fitting on the damaged pump prior to installing the replacement pump. The cheater pipe suddenly slipped, causing plaintiff to experience sharp pain in his back. Thereafter, plaintiff sat down while the roustabout completed installing the replacement pump. Later that morning plaintiff returned to shore where he saw a physician for treatment of his back. On July 21, 1986 plaintiff underwent surgery to his back. Two additional surgeries were subsequently performed on plaintiff's back.

On October 22, 1986 plaintiff filed this action against defendants, contending that "the platform in question was defectively designed, was improperly supervised, and was in a state of disrepair, and was negligently maintained by the agents or employees of defendants...." Plaintiff's Original Complaint at Section 11, ¶¶ 3; Joint Pretrial Stipulations filed April 18, 1988 at pp. 2–3. Shortly before the start of trial plaintiff expressed his intention to waive any claims of strict liability and to proceed to trial only on his claims of negligence against defendants. At trial plaintiff argued that employees of Chevron or Noble were responsible for turning off the flow of water to the

---

1. Defendants argued at trial that plaintiff could have easily taken steps to render the equipment non-operational, or at least placed a warning sign on the unit.

bayrite effluent return pump, thereby causing the pump to malfunction and disperse drilling mud on the deck. This in turn created hazardous working conditions which defendants failed to correct. Following the testimony of plaintiff and plaintiff's marine safety expert, plaintiff rested his case on the issue of liability. Thereupon, Chevron and Noble made motions for directed verdict contending that as a matter of law the evidence of their alleged negligence was insufficient to create a factual issue for the jury to consider. Defendants argued that they owed no legal duty to plaintiff to prevent him from lifting the damaged pump without assistance while standing in drilling mud. In addition, defendants argued that plaintiff's disregard for his own safety was the sole legal cause of his injury.

LAW:

We have jurisdiction of this matter pursuant to 28 U.S.C. § 1331; 43 U.S.C. § 1331 *et seq.* Because the applicable law in this case is defined by the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1333(a)(2)(A), we apply the law of the adjacent state, Louisiana, as surrogate federal law to the extent that it is not inconsistent with federal laws and regulations. *Gulf Offshore Co. v. Mobil Oil Corp.,* 453 U.S. 473, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981); *Rodrigue v. Aetna Cas. & Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court repeated the standard to be used by the district court when determining whether there is sufficient evidence to submit a case to the jury in connection with a motion for directed verdict:

> [T]he trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.... If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.... As the Court long ago said in *Improvement Co. v. Munson,* 14 Wall

442, 448, 20 L.Ed. 867 (1872), and has several times repeated:

> "Nor are judges any longer required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party. Formerly it was held that if there was what is called a *scintilla* of evidence in support of a case the judge was bound to leave it to the jury, but recent decisions of high authority have established a more reasonable rule, that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." (footnotes omitted).

*Anderson,* 477 U.S. at 251, 106 S.Ct at 2511, 91 L.Ed.2d at 213 (citations omitted). This standard for review of the sufficiency of the evidence is "firmly established" as set forth in *Boeing Co. v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (en banc):

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-movers case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judg-

ment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

*See also In re Letterman Bros. Energy Securities Litigation,* 799 F.2d 967, 971–72 (5th Cir.1986); *Doucet v. Diamond M Drilling Co.,* 683 F.2d 886, 889–90 (5th Cir.1982); *McCormack v. Noble Drilling Corp.,* 608 F.2d 169, 171–72 (5th Cir.1979); *Cox v. C.H. Masland & Sons, Inc.,* 607 F.2d 138, 144 (5th Cir.1979).

In the instant case, liability of the defendants must be based upon the concept of fault under La. C.C. arts. 2315 and 2316. In order to determine whether liability exists under the facts of a particular case, Louisiana courts employ a "duty-risk" analysis. Under this analysis, plaintiff must prove by a preponderance of the evidence that:

1. The conduct of the particular defendant was a cause-in-fact of plaintiff's injury;

2. A duty was imposed by law on the defendant to protect plaintiff from that injury arising under the circumstances of the case;

3. The defendant violated the duty with respect to plaintiff—in other words, the defendant acted unreasonably; and

4. Damages were sustained.

*Mart v. Hill,* 505 So.2d 1120 (La.1987); *Hill v. Lundin & Associates, Inc.,* 260 La. 542, 256 So.2d 620 (1972); *Blanchard v. Riley*

*Stoker Corp.,* 492 So.2d 1236 (La.App. 4th Cir.1986); Crowe, *The Anatomy of a Tort —Greenien, as Interpreted by Crowe Who Has Been Influenced by Malone—a Primer,* 22 Loyola L. Rev. 903 (1976).

Generally it is not difficult for a plaintiff to establish cause-in-fact. The plaintiff is not required to prove that the particular defendant's conduct was the only cause or the proximate cause of his injury. He simply must demonstrate that the defendant's conduct was a substantial factor that contributed to his harm. *Andrus v. Trailers Unlimited,* 647 F.2d 556, 558 (5th Cir. 1981). "[I]f the plaintiff can show that he probably would not have suffered the injury complained of but for the defendant's conduct, he has carried his burden of proof relative to cause in fact." *Shelton v. Aetna Casualty & Surety Co.,* 334 So.2d 406, 409 (La.1976).

While plaintiff failed to establish that either Chevron or Noble committed active negligence that caused his injury,[2] he was able to show that defendants failed to take any action to clean the drilling mud from the deck or otherwise prevent plaintiff's accident from occurring. Affirmative conduct, as envisioned under the duty-risk analysis, includes acts of omission as well as commission. Thus, plaintiff has established that the defendants' acts of omission were causes-in-fact of his injury. But for the presence of drilling mud on the platform deck, and the defendants' failure to clean the deck or intervene in plaintiff's activity at the time, the accident to plaintiff would not have occurred.

The next element which plaintiff must establish is that the defendants breached some legal duty imposed to protect against the particular risk involved. While a de-

---

2. Plaintiff testified that someone repeatedly shut off the flow of water to the bayright effluent return pump. This action allegedly caused the pump housing to crack, and ultimately, mud to spew from the pump. Plaintiff, however, did not introduce any evidence, through expert testimony or otherwise, to substantiate his claim that lack of water to the pump caused the housing to crack and release mud. Plaintiff testified that he did not actually see anyone turn off the water valve, and therefore he could not identify who was responsible. He surmised, however, that the person or persons responsible must have been employed by Noble or Chevron, although he could not rule out the possibility that someone employed by one of the service companies that was working on the platform—Halliburton or Schlumberger—may have been responsible. In other words, plaintiff's argument that defendants caused the centrifuge skid to malfunction was no more than conjecture on his part.

fendant's conduct may have created some risk of injury to plaintiff or to others, liability of that defendant must depend upon some principle of law which encompasses the defendant's conduct *and* protection of the plaintiff against the risk of injury created by that conduct. *Andrus v. Trailers Unlimited, supra* at 558–59. Therefore, our inquiry must consist of the following: (1) What, if any, duties were owed by defendants to plaintiff? (2) Was there a breach of those duties? (3) Was the risk and harm caused, within the scope of protection afforded by any of the duties that were breached? *Shelton v. Aetna Casualty & Surety Co., supra.*

For the purpose of determining liability under La. C.C. arts. 2315 and 2316, the duties of an owner of an offshore oil platform are similar to those duties owed by an owner or occupier of land. *See, e.g., Bourg v. Texaco Oil Co., Inc.,* 578 F.2d 1117 (5th Cir.1978); *Olsen v. Shell Oil Co.,* 365 So.2d 1285 (La.1978). *Compare* terminology in *Owen v. Kerr–McGee Corp.,* 698 F.2d 236, 239 (5th Cir.1983) (owner and operator of a facility); *Walker v. Union Oil Mill, Inc.,* 369 So.2d 1043, 1047 (La.1979) (owner and operator of a facility); *Shelton v. Aetna Casualty & Surety Co., supra* at 410 (landowner); *Waters v. McDaniel Recreation Center, Inc.,* 521 So.2d 788, 792 (La. App.2d Cir.1988) (occupier of premises); *Wallace v Slidell Memorial Hospital,* 509 So.2d 69, 73 (La.App. 1st Cir.1987) (owner of immovable property). In *Shelton v. Aetna Casualty & Surety Co., supra,* the Louisiana Supreme Court stated that "the proper test to be applied in determining a landowner's liability under articles 2315 and 2316 of the Civil Code is 'whether in the management of his property he has acted as a reasonable man in view of the probability of injury to others.'" 334 So. 2d at 410 (quoting *Cates v. Beauregard Electric Cooperative, Inc.,* 328 So.2d 367, 371 (La.1976). The landowner's duty includes the responsibility to discover any unreasonably dangerous conditions on his premises and to either correct those conditions or warn potential victims of their existence. *Id.* at 410. However, the court also stated that "The duty of a landowner is not to insure against the possibility of an accident on his premises, but rather to act reasonably in view of the probability of injury to others. Thus the landowner is not liable for an injury resulting from a condition which should have been observed by an individual in the exercise of reasonable care or which was as obvious to a visitor as to the landowner." *Id.* at 410 (citations omitted).

Similarly, in a recent decision, the Louisiana Second Circuit Court of Appeal reaffirmed earlier jurisprudence explaining the duty:

The duty of an occupier of premises to an invitee is to exercise reasonable or ordinary care for his safety commensurate with the particular circumstances involved. The occupier thus owes a duty to avoid reasonably foreseeable danger to his invitee and to keep his premises safe from hidden dangers in the nature of traps or pitfalls in that they are not known to the invitee and would not be observed and appreciated by him in the exercise of ordinary care. This includes the duty of reasonable prior discovery of such unobservable dangerous conditions of the premises, and correction thereof or a warning to the invitee of the danger.

On the other hand, the occupier does not insure an invitee against the possibility of accident. The invitee assumes all normally observable or ordinary risks attendant upon the use of the premises. The occupier is not liable for an injury to an invitee resulting from a danger which is observable or which should have been observed by the invitee in the exercise of reasonable care, or from a danger which the invitee should reasonably have appreciated before exposing himself to it.

*Waters v. McDaniel Recreation Center, Inc.,* 521 So.2d 788, 792 (La.App.2d Cir. 1988) (quoting *Levert v. Travelers Indemnity Co.,* 140 So.2d 811, 813 (La.App. 3rd Cir.1962) and *Lear v. United States Fire Ins. Co.,* 392 So.2d 786, 789 (La.App. 3rd Cir.1980)).

██ We hold that neither Chevron nor the drilling operator working on its platform, Noble Drilling Corporation, failed to

exercise reasonable care under the circumstances, and therefore, neither is liable for plaintiff's injury. During his testimony at trial, plaintiff repeated that prior to his accident he had observed drilling mud on the deck in the immediate vicinity of the centrifuge skid. At one point plaintiff saw mud flinging and spewing from the bay-right effluent return pump. He also witnessed mud dripping onto the deck when he himself disconnected various flow lines to and from the pump. Plaintiff also testified that he had worked in similar situations before. As a sales and service technician for Geolograph, plaintiff frequently encountered drilling mud when installing, repairing, and removing mud equipment on offshore platforms. He was certainly aware that drilling mud can be slippery to walk upon. Despite this knowledge and having plainly seen the mud on the deck, plaintiff made no effort to wash the mud from the deck or to notify anyone with Chevron or Noble so that their employees could clean the area. Instead, he chose to stand in the mud and lift the pump without assistance. The only reason that plaintiff offered for not taking remedial action beforehand was that he did not consider the conditions hazardous and did not anticipate a problem with lifting the pump alone. Thus, it is clear under the circumstances that plaintiff was fully aware of the hazardous condition complained about but voluntarily chose to encounter it anyway, and thereby failed to exercise reasonable care for his own safety. There was no breach of duty on the part of defendants and plaintiff's own negligence was the sole proximate cause of the accident. *See Silliker v. St. Landry Parish Police Jury,* 520 So.2d 880 (La.App. 3rd Cir.1987); *Calhoun v. Royal Globe Ins. Co.,* 398 So.2d 1166 (La. App. 2d Cir.1981); *Verdin v. South Coast Corp.,* 366 So.2d 1001 (La.App. 1st Cir. 1978), *writ refused,* 368 So.2d 124 (La. 1979); *Smith v. United States Fidelity & Guaranty Co.,* 351 So.2d 1261 (La.App. 1st Cir.1977); *Vidrine v. Missouri Farm Assn.,* 339 So.2d 877 (La.App. 3rd Cir.1976), *writ refused,* 342 So.2d 216 (La.1977).

■ We also hold that the defendants did not owe a duty to plaintiff to intercede in the manner in which plaintiff chose to perform his task. Under Louisiana law, a principal who hires an independent contractor over which he exercises no operational control has no duty to ensure, through instructions or supervision, that the independent contractor will perform its obligations in a reasonably safe manner. *Ainsworth v. Shell Offshore, Inc.,* 829 F.2d 548 (5th Cir.1987); *Hawkins v. Evans Cooperage Co., Inc.,* 766 F.2d 904 (5th Cir. 1985); *Wallace v. Oceaneering Int'l,* 727 F.2d 427 (5th Cir.1984); *McCormack v. Noble Drilling Corp.,* 608 F.2d 169 (5th Cir. 1979); *Robideaux v. Hebert,* 118 La. 1089, 43 So. 887 (1907); *Blanchard v. Riley Stoker Corp., supra.* Furthermore, a principal who exercises no operational control does not have a duty to discover and remedy hazards created by the acts of its independent contractor. *Hawkins, supra* at 908; *Wallace, supra* at 437. Chevron hired Geolograph Pioneer in order to install, maintain and repair the centrifuge unitized skid in conjunction with the drilling operations on its platform. Plaintiff admitted that no Chevron or Noble employee directed the details of the installation or repair work which he performed. It is clear from the evidence that defendants did not retain control over the manner in which plaintiff performed his job on the platform, and particularly, did not retain control over the work which plaintiff was performing at the time of his injury. Accordingly, defendants had no duty to take any affirmative action in order to prevent plaintiff from lifting a heavy object without assistance while standing in drilling mud or from using a cheater pipe to disassemble equipment.

Having found that plaintiff has failed to make a sufficient showing concerning essential elements of his case, i.e., that defendants had a legal duty to protect him from the risk of harm encountered in this case and that defendants breached that duty, we hold that there is no genuine issue as to any material fact which could properly be submitted to the jury. Defendants therefore are entitled to a directed verdict as a matter of law and judgment is entered

in their favor, dismissing plaintiff's negligence claims with prejudice.