Donald **COOPER**

v.

**OFFSHORE EXPRESS, INC., et al.**

**Civ. A. No. 85–3050.**

United States District Court,
W.D. Louisiana,
Opelousas Division.

July 24, 1989.

---

Charles M. Thompson, Jr., Thompson & Sellers, Abbeville, La., for plaintiff.

James Womack & Andrew C. Wilson, Burke & Mayer, New Orleans, La., Timothy J. McNamara, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for defendants.

Gene Fendler & Don K. Haycraft, Liskow & Lewis, New Orleans, La., for third-party defendants.

Nicholas Gachassin, Jr. & Robert A. Mahtook, Jr., Gachassin, Hunter, Severance & Sigur, Lafayette, La., for intervenor.

## OPINION

### FINDINGS OF FACT

**NAUMAN S. SCOTT, District Judge.**

1. Plaintiff Donald Cooper was employed by Oceanic Butler, Inc. as a steward aboard the West Cameron 509 platform in November 1984. Plaintiff was responsible for preparing all meals, supervising the galley and maintaining the living quarters on the platform.

2. West Cameron 509 is a pipeline compressor station platform located on the Outer Continental Shelf off the Louisiana coast. The 509 platform is owned and operated by third-party defendants Stingray Pipeline Company, Trunkline Offshore Company, NGPL Offshore Company, Panhandle Eastern Company and Panhandle Eastern Pipeline Corporation. (Stingray).[1]

3. Stingray contracted plaintiff's employer Oceanic Butler to provide catering and housekeeping services on its 509 platform. (Master Catering Service Contract).

4. Stingray contracted defendant Brown & Root, Inc. to install two recuperators and perform other construction on its 509 platform. (Construction Contract).

5. Brown & Root, to perform its contractual obligations, in particular, to deliver the recuperators and other equipment and to house its workers, time-chartered the M/V CHAMPION EXPRESS from defendants Offshore Express, Inc. and Shearson Equipment Investors III. (Offshore).[2]

6. The 509 platform consists of three separate but physically linked platforms, platforms A, B and C.[3] Platform C holds the galley and living quarters and is the smaller, hence less stable, platform. Platform A is a four-pile platform with a helicopter pad on top. Platform B is an eight-pile platform, containing the bulk of machinery for the compressor station operations.

7. The CHAMPION EXPRESS left Sabine Pass, Texas, in the early hours of November 29, 1984, loaded with two recuperators and other equipment. The CHAMPION EXPRESS sailed undermanned, with a crew of four instead of five, as required by its Certificate of Inspection. The CHAMPION EXPRESS was absent a licensed engineer.[4]

8. The CHAMPION EXPRESS arrived at the 509 platform in the morning of November 29, 1984. Light equipment was

---

1. The parties have stipulated that, among the various Stingray entities, Stingray Pipeline Company and Trunkline Gas Company constitute the proper defendant.

 Defendants Offshore Express, Inc. and Shearson Equipment Investors III third-partied Stingray and tendered Stingray to plaintiff as a party defendant pursuant to Federal Rule of Civil Procedure 14(c).

2. Shearson owned the CHAMPION EXPRESS and Offshore operated the CHAMPION EXPRESS. For purposes of this case, counsel informed the Court that there is no distinction between the two corporations. The Operating Agreement between the two indicates that Offshore functions as Shearson's agent.

3. Our factual orientation of the scene refers to the large photograph of the 509 platform introduced into evidence as Grosskopf No. 2. All parties used this photograph as a reference at trial.

4. The captain of the CHAMPION EXPRESS had fired the chief engineer during the early morning of November 28 while docked at Cameron, Louisiana. Offshore informed the captain that another engineer would be flown to the 509 platform.

unloaded but not the recuperators.[5] Also, apparently, Brown & Root personnel were transferred. Thereupon, with weather conditions deteriorating, the CHAMPION EXPRESS left the platform. A crew member of the CHAMPION EXPRESS was injured during this unloading and disembarked for evacuation from the platform by helicopter.[6]

9. In the morning of November 30, 1984, the CHAMPION EXPRESS returned to the 509 platform, now short two crew members. An attempt was made to unload the recuperators at platform B. However, the vessel's bow thrusters began to fail and the captain had to shut them down.[7] The lack of maneuvering capability, in combination with the rough seas, led the Brown & Root construction manager Terry Chandler to cancel the attempt to unload.[8] The CHAMPION EXPRESS left the platform.

10. Shortly thereafter, the CHAMPION EXPRESS appeared at platform A. It is unclear why the CHAMPION EXPRESS approached platform A: perhaps either to embark its two replacement crewmen who had been flown to the platform that morning, or to disembark Brown & Root personnel from the vessel.[9] Regardless, the CHAMPION EXPRESS, in approaching the platform, struck platform A.

11. Terry Chandler of Brown & Root was in the turbine room on platform B and felt the impact. He proceeded to the landing area on platform A in an attempt to wave off the CHAMPION EXPRESS. Wayne Crabb, operations foreman for Stingray, was at the compressor level of platform B and felt the impact. Paul Grosskopf, construction project manager for Stingray, was in the control room on platform B and also felt the impact, which shook the flourescent light fixtures in the room. Grosskopf proceeded to tell the radio operator to instruct the CHAMPION EXPRESS to move away. The vessel moved from platform A.

12. Shortly thereafter, Wayne Crabb, Stingray's platform foreman, instructed the radio operator to inform the CHAMPION EXPRESS that it could attempt to onload its personnel at the landing area on platform C.[10]

13. The CHAMPION EXPRESS thereupon approached the weather-side of the landing area on platform C sideways or broadside, and not stern-to with the bow headed into the wind.[11] The attempted personnel transfer, by means of swinging lines, failed. In its attempt, the CHAMPION EXPRESS struck platform C twice. The second impact was extremely forceful.

14. Terry Chandler of Brown & Root was on platform B and felt the first impact. He immediately proceeded to platform C to attempt to wave off the vessel. As Chandler crossed the catwalk to platform C, the second impact occurred. The force of the impact knocked Chandler, at six feet 240 pounds, to his knees.

15. Paul Grosskopf of Stingray was in the doorway to the galley on platform C and felt the first impact. He immediately

---

**5.** Each recuperator weighs approximately 52,000 pounds.

**6.** A replacement for the injured crewman was flown to the platform along with the new engineer in the morning of November 30. *See* Note 4, *supra.*

**7.** The vessel's daily log for the next day (December 1) notes that the bow thruster had 'gone out'.

**8.** The seas were variously set by the testimony from 4 to 16 feet. *Regardless, a preponderance of the evidence describes the seas as inordinately rough.*

**9.** The captain testified (by deposition) that he was 'told to' come pick up his crew members. The captain's deposition testimony is extremely recalcitrant and lacks credibility. There is no other evidence that the captain was 'ordered' to pick up his crew, or directed to platform A by someone from the platform.

**10.** Logic dictates that the captain radioed for permission, or suggestions where, to pick up his two replacement crew members, but Crabb does not remember and the captain does not say.

**11.** The wind was blowing approximately in the direction represented by the catwalk between platforms B and C, and towards platform C, the side of platform C where the CHAMPION EXPRESS attempted its landing. *See* Note 3, *supra.*

proceeded to the lower deck of platform C to attempt to wave off the vessel. Grosskopf felt the platform move when the second impact occurred.

16. The replacement engineer, standing at the landing area on platform C while waiting to attempt to board the vessel, observed the impacts and was concerned that his vessel had been holed.

17. At the time of the impacts, plaintiff was in the galley preparing the noon meal. From his work station, plaintiff could not see a vessel approach the landing area, located 60–70 feet directly below the galley.

18. With the first impact, plaintiff was jostled, and gumbo from a pot on the stove spilled. Plaintiff proceeded to clean up the spilled gumbo.

19. With the second impact, plaintiff was thrown into a large butcher block table, striking the lower part of his back. Except for one week five months later, plaintiff has not returned to work. After considerable conservative treatment and testing, a herniated disc with nerve root irritation was diagnosed. In October 1985, as a result of the incident herein, plaintiff underwent a foraminotomy, laminectomy and diskectomy (at L4–5).[12]

## CONCLUSIONS OF LAW

1. We have admiralty jurisdiction under the Admiralty Jurisdiction Act. 46 U.S.C. App. § 740. *See Continental Oil Co. v. London Steam–Ship Owners' Mutual Insurance Association,* 417 F.2d 1030 (5th Cir.1969), *cert. denied,* 397 U.S. 911, 90 S.Ct. 911, 25 L.Ed.2d 92 (1969). *Cf. Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.,* 644 F.2d 1132 (5th Cir.1981). *See also Rodrigue v. Aetna Casualty and Surety Co.,* 395 U.S. 352, 360, 89 S.Ct. 1835, 1839, 23 L.Ed.2d 360, 367 (1969); *Gutierrez v. Waterman Steamship Corp.,* 373 U.S. 206, 209, 83 S.Ct. 1185, 1188, 10 L.Ed.2d 297, 301 (1963).

■ 2. Under general maritime law, when a moving vessel collides with a stationary object (including a dock), there is a presumption of negligence against the moving vessel. *The Oregon,* 158 U.S. 186, 192–93, 15 S.Ct. 804, 806–08, 39 L.Ed. 943 (1895); *American Petrofina Pipeline Co. v. M/V Shoko Maru,* 837 F.2d 1324, 1326 (5th Cir.1988); *Delta Transload, Inc. v. M/V Navios Commander,* 818 F.2d 445, 449 (5th Cir.1987); *United States v. T/B Arcadian,* 714 F.2d 470, 474 (5th Cir.1983). The presumption derives from the common-sense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way. *Delta Transload, supra* at 449; *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790, 795 (5th Cir.1977), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978).[13]

---

**12.** Offshore factually challenges causation vigorously. Offshore asks us to infer a second and causative incident during the week plaintiff returned to work in May 1985 simply because a herniated disc was not diagnosed until after that brief work stint. The preponderant evidence does not support such an inference.

Diagnosis of back trauma and its symptomology is simply not an exact process. The medical testimony is therefore inherently reluctant; the responses to hypotheticals are necessarily tentative. Not a single physician convincingly confirms Offshore's asserted inference. Medical probabilities are evidence, not standards of legal proof.

In particular, the two physicians who treated plaintiff before his brief return to work, Dr. Miller and Dr. Alleman: Dr. Miller noted that the CAT scan he performed was not 100% accurate. (Plaintiff's surgeon, Dr. Bertuccini, similarly described CAT scans.) And, Dr. Miller did not perform a myelogram or an MRE. Further, Dr. Alleman testified, by deposition:

> I have seen many patients who initially show no physical evidence of the true nature of their injury who subsequently do have disc surgery ... For a disc to become asymptomatic at one point to suggest that the patient is recovered and later have sufficient symptoms to require surgery, it's not unusual.

In the face of a preponderance of evidence which supports causation, Offshore offers not a shred of evidence concerning plaintiff's work for the week or so he returned. Offshore's factual challenge is purely speculative. Indeed, the medical testimony is unanimous that, absent indication of a second incident, the accident here was the source of plaintiff's injury.

**13.** Offshore apparently contends that *Scindia* governs its obligations because plaintiff is a covered employee under the LHWCA. *See Scindia Steam Navigation Co. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

3. The presumption operates to shift the burden of proof—both the burden of producing evidence and the burden of persuasion—onto the moving ship. *American Petrofina, supra* at 1326. The moving ship may rebut the presumption by showing, with a preponderance of the evidence, that the collision was the fault of the stationary object, that the moving ship acted with reasonable care, or that the collision was an unavoidable accident. *American Petrofina, supra* at 1326.

4. Offshore has utterly failed to rebut the presumption of negligence.

The master of a ship is the "lord of his little world". *Stevens v. Seacoast Co.*, 414 F.2d 1032, 1036 (5th Cir.1969). Thus, "normally the master of a ship has the final say so in deciding what risks posed by the weather and the condition of his ship will be assumed." *Brown v. Link Belt Division of FMC Corp.*, 666 F.2d 110, 113 (5th Cir.1982).

5. The uncontested testimony of plaintiff's marine expert, Rudy Vorenkamp, is that the attempt of the CHAMPION EXPRESS to lay alongside platform C sideways, and on the weatherside, was improper seamanship. As a result, heavy impact upon the platform was inevitable. The failing/failed bow thrusters exacerbated the hazards of the attempted manuever.

The captain had earlier encountered difficulties in approaching the platform, when he bumped platform A and was instructed to move away. No one ordered or required the captain to pick up his own replacement crew members. The only reason the CHAMPION EXPRESS again approached the platform was to bring its crew up to full complement. The evidence simply does not support the contention of Offshore's

platform expert that lack of coordination and communications on or from the platform led to the collision. *No one* on the platform was in as good a position as the captain to assess the difficulties posed by the weather and the vessel's condition. *See Brown, supra* at 114. No one on the platform ordered the broadside approach.

The captain's ill-conceived and imprudently managed approach to the landing area on platform C resulted in a violently forceful impact upon the platform and constituted failure to exercise ordinary care, caution and maritime skill. The captain's negligence proximately caused plaintiff's injuries.

6. In the traditional time-charter arrangement, the charterer directs the commercial activities of the vessel, determines where and when the vessel will travel and designates the cargo that the chartered vessel will carry; but,

> The owner's people continue to navigate and manage the vessel.... The time charter is used where the charterer's affairs make it desirable for him to have tonnage under his control for a period of time, without undertaking the responsibility of ship navigation and management or the long-term financial commitments of vessel ownership.

*Kerr–McGee Corp. v. Ma–Ju Marine Services, Inc.*, 830 F.2d 1332, 1340 (5th Cir. 1987) (quoting G. Gilmore & C. Black, *The Law of Admiralty*, § 4–1).

"Possession and control remain with the owner and the ship is operated by its regular crew, but the charterer determines the ship's routes and destinations." *Migut v. Hyman–Michaels Co.*, 571 F.2d 352, 355 (6th Cir.1978). "Generally ... a time char-

---

However, plaintiff is not directly or expressly covered by the LHWCA. *See Pizzitolo v. Electro–Coal Transfer Corp.*, 812 F.2d 977 (5th Cir. 1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1013, 98 L.Ed.2d 978 (1988). Instead, plaintiff is an offshore worker covered under the LHWCA only by virtue of the OCSLA, 43 U.S.C. § 1333(b). *See Longmire v. Sea Drilling Corp.*, 610 F.2d 1342 (5th Cir.1980). Plaintiff had no connection or relationship with Offshore's vessel. Accordingly, even were we to characterize plaintiff's action as a 905(b) claim, we would

not apply the maritime law developed in *Scindia. Cf. Kerr–McGee Corp. v. Ma–Ju Marine Services, Inc.*, 830 F.2d 1332, 1340 n. 8 (5th Cir.1987). *Scindia* applies specifically to stevedores; and otherwise, only to workers who work on, with, or for vessels. *See Teply v. Mobil Oil Corp.*, 859 F.2d 375, 377 (5th Cir. 1988). That is simply not this plaintiff's situation. The maritime law applied here is the general maritime law of negligence. *See* Brown, *General Principles of [Collision] Liability*, 51 Tul.L.R. 820 (1977).

terer, one who has no control over the vessel, assumes no liability for negligence of the crew or unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise." *Mallard v. Aluminum Co. of Canada, Ltd.,* 634 F.2d 236, 242 n. 5 (5th Cir.1981), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981). "It is well-established that the time-charterer is not responsible for navigational errors committed by the pilot." *Kerr–McGee, supra* at 1341. (citing *Continental Oil Co. v. Bonanza Corp.,* 706 F.2d 1365, 1372 (5th Cir.1983) and *Delta Transload, supra.*).

■ 7. The agreement between Brown & Root and Offshore is a "fully found" charter. Such a charter does not alter the traditional allocation of duties and control between time-charterer and vessel. *See Winn v. Commissioner,* 595 F.2d 1060, 1062 (5th Cir.1979); *Federal Barge Lines, Inc. v. SCNO Barge Lines, Inc.,* 711 F.2d 110, 112 (8th Cir.1983). Accordingly, Brown & Root had no duty to interject itself into the hazardous situation created by its charter, the CHAMPION EXPRESS.

The evidence shows that Brown & Root did no more than direct the commercial activities of the CHAMPION EXPRESS. Brown & Root did not order or force the CHAMPION EXPRESS out in treacherous conditions. *See Tarlton v. Exxon,* 688 F.2d 973, 976–77 (5th Cir.1982), *cert. denied,* 463 U.S. 1206, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983). Nor did the attempts by Terry Chandler of Brown & Root to wave off the vessel constitute control over the vessel, or active negligence.

■ 8. Under Louisiana and the general maritime law, a principal is not liable for the negligent acts of its independent contractor. *Hawkins v. Evans Cooperage,* 766 F.2d 904 (5th Cir.1985); *Wallace v. Oceaneering Intn'l,* 727 F.2d 427 (5th Cir. 1984); *McCormack v. Noble Drilling Corp.,* 608 F.2d 169 (5th Cir.1979). An exception to the rule applies, however, when a principal retains control over the "operative details" of the independent contractor's work. *Hawkins, supra* at 906–

08; *Wallace, supra* at 437. To impose liability on the employer for the negligent acts of an independent contractor:

> [T]he employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to the employer, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

*McCormack, supra* at 175 n. 9 (quoting Restatement (Second) of Torts § 414, comment at 388 (1965)); *Grammer v. Patterson Services, Inc.,* 860 F.2d 639, 644–45 (5th Cir.1988). ("only instructions designating 'how to' conduct operations merit application of the operational control execption").

■ Accordingly, the principal is generally not liable for injuries caused by a negligent independent contractor despite the fact that the principal monitors the progress of the work to ensure that the results it contracted-for are achieved. *Hawkins, supra* at 908; *Wallace, supra* at 436. Moreover, a principal who exercises no operational control has no duty to discover and remedy hazards created by its independent contractors. *Hawkins, supra* at 908; *Wallace, supra* at 437. The principal has no duty to ensure, through instructions or supervision, that the independent contractor performs its obligations in a safe manner. *Hawkins, supra* at 908; *McCormack, supra* at 175.

■ 9. There is no evidence that Stingray exercised the control over Brown & Root and the CHAMPION EXPRESS contemplated by the operational control excep-

tion. Stingray did not order, or determine the manner of, the CHAMPION EXPRESS's approach to platform C. Wayne Crabb of Stingray either granted permission, or suggested, to the captain to try platform C. Such action does not constitute operational control. Similarly, Paul Grosskopf's radio instructions to move away from platform A and his attempt to wave off the vessel from platform C do not constitute operational control. Nor do these actions constitute active negligence. Further, Stingray had no duty to interject itself into the navigational methods of the vessel's captain.[14]

10. Plaintiff's conduct was reasonable under the circumstances. Plaintiff had no duty to look out, or otherwise anticipate and prepare, for the approach of vessels to the platform.

11. We apportion liability in this matter as follows. See *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975); *Leger v. Drilling Well Control, Inc.*, 592 F.2d 1246 (5th Cir. 1979); *Lewis v. Timco, Inc.*, 716 F.2d 1425 (5th Cir.1983); *Texas Eastern Transmission Corp. v. McMoRan Offshore Exploration Co.*, 863 F.2d 355, 362 (5th Cir. 1989).

| | |
|---|---|
| Offshore | 100% |
| Stingray | 0% |
| Brown & Root | 0% |
| Plaintiff | 0% |

12. We now consider the contractual indemnity claims brought by Brown & Root against Stingray pursuant to their Construction Contract, and brought by Stingray against Oceanic Butler pursuant to their Master Catering Service Contract. We apply Louisiana law to these contracts. See *Copous v. Odeco Oil & Gas Co.*, 835 F.2d 115 (5th Cir.1988); *Thurmond v. Delta Well Surveyors*, 836 F.2d 952 (5th Cir. 1988); *Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514 (5th Cir.1988); *Doucet v. Gulf Oil Corp.*, 783 F.2d 518 (5th Cir. 1986), *cert. denied*, 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223 (5th Cir.1985.)[15]

13. The Louisiana Oilfield Indemnity Act, La.R.S. 9:2780, renders unenforceable the indemnity provisions in these contracts, except with regard to costs of defense. *Meloy v. Conoco, Inc.*, 817 F.2d 275 (5th Cir.1987). See *Copous, supra; Stoot, supra.* See also, *Ferguson v. Stingray Pipeline Co.*, 672 F.Supp. 944 (W.D.La. 1987).[16]

*Meloy* explains that "[t]he Act does not apply where the indemnitee is not negligent or at fault." *Meloy, supra* at 280. Upon determination that the indemnitee is not at fault, "the Act does not prohibit indemnification for cost of defense." *Meloy, supra* at 280. See also, *Melancon v. Amoco Production Co.*, 834 F.2d 1238 (5th Cir.1988), *amended on rehearing*, 841 F.2d 572 (5th Cir.1988); *Tanksley v. Gulf Oil Corp.*, 848 F.2d 515 (5th Cir.1988).

14. We have determined that Brown & Root and Stingray are not at fault in this

---

14. Offshore contends Stingray violated its duties as an offshore wharfinger. *Bunge, supra* at 795; *Trade Banner Line, Inc. v. Caribbean Steamship Co.*, 521 F.2d 229 (5th Cir.1975). On the contrary, the landing area at platform C had no hidden hazard or deficiency, and Stingray had no duty to warn the captain that the CHAMPION EXPRESS must not strike the platform violently or with undue force.

Similarly, Stingray's platform contained no defects about which Louisiana law required it to issue a warning. See *McIlwain v. Placid Oil Co.*, 472 F.2d 248 (5th Cir.1973), *cert. denied*, 412 U.S. 923, 93 S.Ct. 2734, 37 L.Ed.2d 150 (1973). See also, *Daigle v. Point Landing, Inc.*, 616 F.2d 825 (5th Cir.1980) (admiralty law).

15. No party contests the applicability of Louisiana law.

16. Stingray dutifully argues that *Meloy* does not require it to indemnify Brown & Root, citing *Ogea v. Loffland Brothers Co.*, 622 F.2d 186 (5th Cir.1980). In *Ogea*, the contract contained an indemnification provision, but also required the contractor to procure insurance naming the platform owner as a co-insured. The *Ogea* court, by viewing the contract as a whole, held that the parties intended no rights of indemnification for the contractor until the limits of the insurance were reached. The situation here is materially different. The Construction Contract does not require Brown & Root to procure insurance for Stingray. See also, *Davis v. Mobil*

matter. Accordingly, Stingray owes Brown & Root its costs of defense, and Oceanic Butler owes Stingray its costs of defense.[17]

■ 15. We now consider plaintiffs damages. We first determine any general damages. Physical pain and suffering, mental anguish and anxiety, past and future, are difficult to value. We have considered specifically the following: the pain, discomfort and distress endured in the months preceding surgery and during the on-going recuperation; the limitations on daily and household activity, recreational and sexual activity, and general uneasiness, imposed by the debilitated back and to which plaintiff testified; the fair to poor prognosis attested by the physicians regarding plaintiff's continuing and future pain and discomfort; the medical testimony discounting psychological overlay at the present time; plaintiff's age and appearance and diligence as a patient. We set general damages of $150,000.00.

16. We adopt the projections offered by plaintiff's economist, Mr. Cornwell, which conform to the parameters and considerations of *Culver. Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir.1984).[18]

17. Using an annual after-tax income of $15,233.90, plaintiff's past lost earnings total $43,386.18. Using an annual value of lost room and board of $4,853.33, plaintiff's past lost room and board total $13,837.59.[19]

18. Plaintiff's future lost earnings, from a work life expectancy of 7.92 years and discounted to present value, total $119,718.57. Present value of future lost room and board totals $35,871.52.

19. Having considered the reports submitted by plaintiff's and Offshore's rehabilitation specialists, plaintiff's condition at trial and the prognosis, we conclude that plaintiff will find, and is capable of employment at minimum wage beginning one year after date of trial. Present value of minimum wage employment, $38,650.84, shall be subtracted from plaintiff's future lost earnings.

■ 20. Under maritime law, prejudgment interest on past losses is discretionary but 'well-nigh' automatic. *See Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1435 (5th Cir.1988). Accordingly, we grant pre-judgment interest at 9.32% for plaintiff's past losses, including $50,000.00 of the general damages. *See Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir.1986).

Plaintiff shall submit a judgment consistent with this Opinion within ten (10) days of this date.[20]

DONE AND SIGNED.

---

*Oil Exploration & Producing Southeast, Inc.*, 864 F.2d 1171, 1176 (5th Cir.1989).

**17.** No evidence of the amounts owed was introduced at trial. The parties are admonished to exhaust all efforts at amicable compromise of the amounts owed before approaching the Court on this issue.

**18.** Both Mr. Cornwell and Offshore's economist, Dr. Wood, calculate approximately the same annual gross income and the same time intervals. We reject Dr. Wood's use of the Camus tables, if only because plaintiff's occupation is not peculiarly offshore-specific. We also reject Dr. Wood's refusal to consider or calculate room and board as a fringe benefit. *See Culver, supra* at 117. We note that neither economist testified. The respective reports addressed to plaintiff's attorney and to Offshore's attorney were, instead, introduced into evidence.

**19.** Income and room and board for the one week plaintiff worked is excluded.

**20.** At trial, the parties indicated that the amount of the intervention would be stipulated. Plaintiff shall consult intervenor Oceanic Butler before submitting his form of judgment. *See Speaks v. Trikora Lloyd P.T.*, 838 F.2d 1436, 1438 (5th Cir.1988).