TRANSCONTINENTAL GAS PIPE LINE
CORPORATION, Plaintiff–Appellee,

v.

TRANSPORTATION INSURANCE
COMPANY, Intervenor–
Appellant,

Lloyds, London, Northern Assurance
Company, Ltd., No. 6 A/c, Minster In-
surance Company, Ltd., No. 3 A/c,
Bishopsgate Insurance PLC. "M" A/c,
Yorkshire Insurance Company, Ltd.
"T", Ocean Marine Insurance Compa-
ny, Ltd., Commercial Union Assurance
Company, London and Hull Maritime
Insurance Company, Ltd., Hansa Ma-
rine Insurance Company, (UK), Ltd.,
Vesta (UK) Insurance Company, Ltd.,
"T" A/c, Chancellor Insurance Compa-
ny, Ltd., National Employers Mutual
Insurance Association, Ltd., Defen-
dants–Appellants.

No. 91–3135.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 1992.

Opinion on Rehearing and Rehearing
En Banc filed April 3, 1992.

James H. Roussell, Sheryl Bey, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Lloyds.

James M. Tompkins, Michael W. Magner, Galloway, Johnson, Tompkins & Burr, New Orleans, La., for Transp. Ins.

Hal J. Broussard, Lafayette, La., for amicus, La., Oilfield Contractors Asso., et al.

Gary A. Bezet, Charles S. McCowan, III, Kean, Miller, Hawthorne, Darmond, McCowan & Jarman, Baton Rouge, La., for Transcontinental Gas Pipe Line Corp.

Before REYNALDO G. GARZA, WIENER, and BARKSDALE, Circuit Judges.

WIENER, Circuit Judge:

This case is another in the burgeoning line of litigation hinging on the interpretation of the Louisiana statute that proscribes indemnification provisions in agreements pertaining to oil, gas and water wells. At issue here is the applicability of the statute to an interstate gas transmission pipeline company's unmanned platforms in the Gulf of Mexico—platforms admittedly unrelated to exploration, drilling or completing gas wells, but admittedly related directly to transportation of natural gas. The Defendants–Appellants appeal from the district court's summary judgment in favor of Plaintiff–Appellee, Transcontinental Gas Pipe Line Corporation (Transco), grounded in the court's determination that the subject statute is inapplicable here. Because we find the uncontested facts revealed in the summary judgment evidence in the record to be insufficient for us to make a *de novo* determination of the statute's applicability, we reverse and remand.

I.

FACTS

Transco is an interstate natural gas transmission and marketing company. Among other things, it owns and operates natural gas pipelines originating in the Gulf Coast areas of Texas and Louisiana and extending through the southeastern states. Transco avers that it does not own or operate natural gas wells. Instead, it purchases natural gas from those persons who drill, produce or operate natural gas wells, transports that gas through its pipeline from the well or from some pickup point remote from the well, such as the tail gates of plants or other facilities, to Transco's gas purchasers throughout the southeastern United States. Transco also avers that as a common carrier it receives gas purchased by third parties from producers whose wells are located in the Offshore Louisiana area and transports that gas, for a fee, as directed by the purchasers of that gas.

In 1987, APS was a Louisiana contractor providing painting, sandblasting, and other services to the oilfield industry. On May 20, 1987, APS and Transco entered into a contract (the contract or the APS/Transco contract) under which APS agreed to perform painting, sandblasting, inspection and "codework" on Transco's platforms and pipelines located in the Gulf of Mexico or in the adjacent marshlands of Louisiana. The contract contained an Insurance Requirement Exhibit that provides: "It is further

agreed that [APS's comprehensive general liability insurance policy] shall name [Transco] ... as an Additional Insured ... with respect to [APS's] operations hereunder." APS named Transco as an additional insured on its comprehensive general liability insurance policy.

On or about May 20, 1987, a foreman for APS was injured on a Transco platform located on the Outer Continental Shelf offshore Louisiana. This employee filed suit in the United States District Court for the Eastern District of Louisiana against APS, Transco and other parties. Transco's demand to APS for indemnification and defense was denied. APS filed for bankruptcy and the court proceedings as to APS were stayed. Transco settled the suit with the injured worker for $225,000.00.

Transco then filed suit against the Defendants alleging that the APS/Transco contract required that Transco be named as an additional insured under the comprehensive general liability policy issued by the Defendants to APS, and that the Defendants' failure to defend and indemnify Transco with respect to the suit by APS's worker was without justification and was arbitrary and capricious. Transco sought indemnity for the amount paid in the settlement, plus penalties and attorney's fees pursuant to Louisiana law. Transco also sought a declaratory judgment that Transportation Insurance Company (TIC), the worker's compensation insurer of APS, was not entitled to reimbursement for compensation benefits it paid to the insured worker.

The Defendants and TIC filed motions for summary judgment. The district court denied those motions [1] addressing only the issue of the applicability of the Louisiana Oilfield Anti–Indemnity Act.[2] Subsequently, the Defendants and TIC moved the district court to amend its judgment and certify to the Louisiana Supreme Court the issue of the applicability of the Act to the instant contract. After the district court requested additional briefing, Transco opposed the motions. Ultimately, the district court refused to amend its judgment.

Transco then filed a motion for summary judgment on the remaining issue of the scope of coverage provided by the Defendants' insurance policy. The Defendants and TIC opposed Transco's motion for summary judgment. In addition, the Defendants requested that the court review its prior ruling on the applicability of the Act to the contract between APS and Transco. The court (1) found that there were no adequate grounds to reconsider its prior decision regarding the applicability of the Act to the contract, and (2) granted Transco's motion for summary judgment on the issue of the scope of coverage provided by the insurance policy.

The district court entered its judgment against the Defendants in the amount of $225,000 plus interest. The Defendants timely appealed the district court's judgment. After the appeal was filed, we granted the request of the Louisiana Oilfield Contractors Association and the Louisiana Pipeline Contractors Association (the *amici curiae*) to file a brief in support of the Defendants' position on the coverage of the Act.

## II.

## STANDARD OF REVIEW

As far as they go, the facts of this case are not disputed. The sole issue is one of the applicability of a statute. As such, we review the decision of the district court *de novo*.

The accident that gave rise to this litigation occurred off the Louisiana coast on a fixed platform located on the Outer Continental Shelf. Federal law applies to the Outer Continental Shelf by reason of the Outer Continental Shelf Lands Act (OCSLA).[3] In OCSLA, Congress directed appli-

---

**1.** *See Transcontinental Gas Pipe Line Corp. v. Lloyds, London,* 734 F.Supp. 708 (M.D.La.1990).

**2.** La.Rev.Stat.Ann. § 9:2780 (West 1991) (hereafter, the Act).

**3.** 43 U.S.C. § 1331 *et seq.*

cation of the laws of adjacent states.[4] We, therefore, apply Louisiana law in this case.[5]

In order to determine state law, federal courts look to final decisions of the highest court of the state. When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide.[6] Furthermore, as a "Lands Act" court, we are bound, as we are in any other case decided under federal law, by prior determinations of the United States Supreme Court and determinations of this court directly applicable to the issues in this case.

The Louisiana Supreme Court has not interpreted the provisions of the Act with regard to whether the Act applies to contracts concerning natural gas transmission pipelines as such. Likewise, we find no prior Fifth Circuit cases directly applicable to this issue.[7] Therefore, it makes no difference whether we sit as a Lands Act court or as a federal court exercising its diversity jurisdiction; under either circumstance our position is analogous to that of a Louisiana appellate court. Furthermore, although we are not bound by state appellate court decisions, we will not disregard them "unless [we are] convinced by other persuasive data that the highest court of the state would decide otherwise."[8]

## III.

## METHOD OF INTERPRETATION

It is helpful to reiterate Louisiana's Civilian methodology with respect to interpreting law and legislation. Under Louisiana's Civil Law tradition, courts look first and foremost to statutory law. The Louisiana Civil Code instructs that "[t]he sources of law are legislation and custom,"[9] and that "[l]egislation is a solemn expression of legislative will."[10] "[T]he primary basis of law for a civilian is legislation, and not (as in the common law) a great body of tradition in the form of prior decisions of the courts."[11] The concept of *stare decisis* is foreign to the Civil Law, including Louisiana.[12] Therefore, in cases such as this we are guided by decisions rendered by the Louisiana appellate courts, particularly when numerous decisions are in accord on a given issue—the so-called *jurisprudence constant*—but we are not strictly bound by them.

We are also guided by the Louisiana legislature's own declarations of how it intends statutes to be interpreted. Words are given their generally prevailing meaning,[13] and the meaning of ambiguous words is "sought by examining the context in which they occur and the text of the law as a whole."[14] "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature."[15] But, "[w]hen the language of the law is susceptible of different meanings, it must be interpreted as having the meaning that best conforms

---

4. *Id.* § 1333(a)(2)(A).

5. *Rodrigue v. Aetna Casualty and Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

6. *Commissioner of Internal Revenue v. Estate of Bosch,* 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967); *West v. American Telephone & Telegraph Co.,* 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139 (1940); *Commonwealth Life Ins. Co. v. Neal,* 521 F.Supp. 812 (M.D.La.), *affirmed* 669 F.2d 300 (5th Cir.1981).

7. We are not bound by *Cooper v. Offshore Express, Inc.,* 717 F.Supp. 1180 (W.D.La.1989), *affd.* 915 F.2d 1569 (5th Cir.1990), for the reasons more fully explored at the text accompanying footnotes 37–39, *infra.*

8. *West,* 311 U.S. at 237, 61 S.Ct. at 183.

9. La.Civ.Code Ann. art. 1 (West Supp.1991). But even "[c]ustom may not abrogate legislation." *Id.* art. 3.

10. *Id.* art. 2.

11. Tate, *Techniques of Judicial Interpretation in Louisiana,* 22 La.L.Rev. 727 (1962).

12. *Ardoin v. Hartford Accident & Indemnity Co.,* 360 So.2d 1331, 1334 (La.1978).

13. La.Civ.Code Ann. art. 11.

14. *Id.* art. 12.

15. *Id.* art. 9.

to the purpose of the law." [16] In addition, "[w]hen a statute is susceptible to two or more interpretations, that which affords a reasonable and practical effect to the entire act is to be preferred to one which renders part thereof ridiculous or nugatory." [17]

## IV.

## ANALYSIS

The Defendants and the *amici curiae* argue that the Act should be given an expansive reading to conclude that it applies to all contracts touching transportation of natural gas, including Transco's contract with APS. Under such a reading, they argue, the Act would render void the Insurance Requirement Exhibit, which mandated that APS name Transco as an additional insured on its comprehensive liability policy. Transco, on the other hand, maintains that the Act applies only to a contract "pertaining to a well" for natural gas. If its contract with APS does not pertain to a well, posits Transco, the contract is not covered by the Act, the waiver of subrogation provision is not void and, in the absence of APS, the Defendants as APS's insurers must indemnify Transco.

The portions of the Act relevant to our discussion are:

A. The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, to the extent those provisions apply to death or bodily injury to persons. It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employ-

ee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.

B. Any provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss of liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

C. The term "agreement," as it pertains to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, as used in this Section, means any agreement or understanding, written or oral, concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, including but not limited to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well drilled for the purpose of producing or excavating, constructing, improving, or otherwise rendering services in connection with any mine shaft, drift, or other structure intended for use in the exploration for or production of any mineral, or an agreement to perform any portion of any such work or services or any act collateral thereto, including the furnishing or rental of equipment, incidental transportation, and other goods and services furnished in connection with any such service or operation.

.    .    .    .    .

---

16. *Id.* art. 10.

17. *Smith v. Cajun Insulation, Inc.,* 392 So.2d 398 (La.1980) citing, *State v. Cazes,* 262 La. 202, 263 So.2d 8 (1972).

G. Any provision in any agreement arising out of the operations, services or activities listed in Subsection C of this section of the Louisiana Revised Statutes of 1950 which require waivers of subrogation, additional named insured endorsements, or any other form of insurance protection, shall be null and void and have no force and effect.

Even if we had not been presented with the contrary interpretations asserted by the parties, we could not help but note the statute's obvious ambiguities. Given an ambiguous or otherwise flawed statute, we turn first to the legislature's purpose in enacting it. According to Subsection A of the Act, it was enacted because the Louisiana legislature found "that an inequity is foisted on certain contractors ... by the defense or indemnity provisions ..., contained in some [1] *agreements pertaining to wells* for oil, gas, or water, or [2] drilling for minerals...." [18] Subsection A goes on to explain the legislature's intention to declare such provisions null and void and against public policy.

In determining the purpose of the Act, we note that the opening paragraph of the Act No. 427 (1981), sets out that the Act was intended:

to amend Title IX of the Louisiana Revised Statutes of 1950 by adding thereto a new section, to be designated as R.S. 9:2780, to provide for the invalidity of certain indemnity agreements affecting industries engaged in the *development, exploration and exploitation* of sources of energy; to provide for exceptions thereto; to provide for the applicability of the Act; and otherwise to provide with respect thereto.[19]

These statements of legislative purpose make no mention of industries engaged in the "transportation" or "transmission" of sources of energy. The Louisiana Supreme Court recently stated the legislature's purpose succinctly:

The purpose of the legislature, and thus the policy interest of the state, is to protect certain contractors, *namely those in oilfields*, from being forced through indemnity provisions to bear the risk of their principals' negligence.[20]

Having declared its intent in Subsection A, the legislature in Subsection B proceeded to implement its intent by declaring null and void, "[a]ny provision contained in ... an *agreement pertaining to a well* for oil, gas, or water...." [21]

The most difficult provision for the interpretation of the Act is Subsection C. Clearly, Subsection C provides the Defendants with their most powerful argument for an expansive interpretation of the Act. It reads in pertinent part, "[t]he term 'agreement,' as it *pertains to a well* for oil, gas, or water ..., means any agreement ... concerning any operations related to the exploration, development, production, or *transportation* of oil, gas, or water...." [22] The Defendants maintain that the contract is related to the transportation of gas, therefore it falls within the language of the Act. But, while they urge this court to read the Act expansively, the Defendants in fact have chosen to read it narrowly.

In the Civil Code, the legislature directs us to decipher the meaning of ambiguous words "by examining the context in which they occur and the text of the law as a whole." [23] In the Act, the legislature does not define the word "transportation" for us or tell us how comprehensive it intended "transportation" to be. The Defendants apparently contemplate that the Act is intended to cover all phases of transportation

---

18. La.Rev.Stat.Ann. § 9:2780(A) (emphasis added). The APS/Transco agreement does not implicate "drilling for minerals," if in fact "drilling for minerals" can be extricated from "wells." Therefore, the portion of the Act concerned with "drilling for minerals" is not directly at issue here.

19. 1981 La.Acts 427 (emphasis added).

20. *Rodrigue v. Legros*, 563 So.2d 248, 254 (La. 1990) (emphasis added).

21. La.Rev.Stat.Ann. § 9:2780(B) (emphasis added).

22. *Id.* § 9:2780(C) (emphasis added).

23. La.Civ.Code Ann. art. 12.

of natural gas. At least they have not acknowledged or provided us with any apparent limit to that aspect of the Act's application. Presumably, under the Defendants' reading, contracts for maintenance of natural gas public utility pipelines and contracts for the transportation of petroleum products from a distributor to a retail outlet or to the ultimate out-of-state or intrastate consumer would be covered by the Act. Little imagination is required in recognizing that such an expansive reading would lead to the "absurd consequences" condemned by the legislature.

On the other hand, we are impressed that in three separate subsections the legislature chose to specify that the contract it wished to limit by the statute is the agreement that "pertains to a well for oil, gas, or water." We dare not ignore that thrice told tale, much less ascribe to its use by the legislature the sin of including mere inoperative surplusage in the Act. In Subsection A, the legislature articulated that the inequities it intended to correct were "contained in some agreements *pertaining to wells.*" (emphasis added). In Subsection B, the legislature declared void only certain provisions "contained in ... an agreement *pertaining to a well.*" (emphasis added). Likewise, Subsection C defines "the term 'agreement' *as it pertains to a well* ... [to mean] any agreement ... concerning any operations related to the exploration, development, production, or *transportation* of oil, gas, or water...." (emphasis added). The fact that the legislature so consistently saw fit expressly to limit the Act's application to agreements *pertaining to a well or to wells* is unavoidable. Nowhere does the statute make reference to agreements in a general sense; in every instance the set of all agreements is limited to the subset of agreements pertaining to a well.

We can come to no conclusion but that the legislature intended the Act to apply if (but only if) an agreement pertains to a well. This is most evident in Subsection C in which the legislature intentionally and explicitly chose wording that limits "agreement" to one pertaining to a well even before it defined the term "agreement." The legislature said:

> The term "agreement," *as it pertains to a well* for oil, gas, or water, or drilling for minerals ... means any agreement or understanding ... concerning any operations related to the exploration, development, or production, or transportation of oil, gas, or water.... (emphasis added).

This choice of wording indicates beyond cavil that the threshold requirement for applicability of the statute is that the contract under scrutiny pertain to a well. In both the operable section of the Act (Section B) and the definition section of the Act (Section C), the pertinence required is to "a well," singular, not "wells," plural, emphasizing the direct nexus needed between the agreement and the particular well to which it pertains.

■ Determining the applicability of the Act is a two-step process. First, there must be an agreement that "pertains to" an oil, gas or water well. If the contract does not pertain to a well, the inquiry ends. Only if we determine that the contract has the required nexus to a well may we proceed to the second step of the process, examination of the contract's involvement with "operations related to the exploration, development, production, or transportation of oil, gas, or water." Although the statute defines an "agreement" pertaining to a well as one concerning "operations related to the exploration, development, production, or transportation of oil, gas, or water," [24] the only sensible interpretation of the statute, when read as a whole, requires that those operations themselves must, first and foremost, pertain to a well. Therefore, if (but only if) the agreement (1) pertains to a well *and* (2) is related to exploration, development, production, or transportation of oil, gas, or water, will the Act invalidate any indemnity provision contained in or collateral to that agreement.

The Defendants contend that even though the contract must pertain to a well, the APS/Transco agreement is covered by

24. La.Rev.Stat.Ann. § 9:2780(C).

the Act because all gas being transported by Transco comes from wells. But, clearly, such a simplistic reading of the statute would render the phrase "pertaining to a well" nugatory, and would lead to a nonsensical result in contravention of the legislature's express principles of interpretation. As the court said in *Clarkco Contractors, Inc. v. Texas Eastern Gas Pipeline* [25]:

> A literal application of the words "transportation of oil, gas or water" would include every train with tank cars of crude oil, refined products or natural gas, every ship carrying any such product into or out of a Louisiana port, every barge load of these products on the Mississippi, the Intercoastal Waterway or other navigable streams, and every tank load of such products upon the highways, even bottled water being hauled to communities with bad tasting water...." [26]

Furthermore, if the legislature had intended the Act to cover every agreement arising from or connected with the transportation of gas and oil—all of which, unlike water, comes from a well—without regard to the proximity of the agreement's sales and services to the "oilfield," [27] it would have been entirely unnecessary for the legislature to incant, in the Biblical thrice, the limiting phrase, "pertaining to a well." In the broad sense urged by the Defendants and *amici curiae*, all gas and oil anywhere would pertain to a well simply because every barrel of oil and every m.c.f. of gas is brought forth from the earth through a well. If that were the intent of the legislature, the triplet phrase would be redundant surplusage beyond reasonable belief.

In arguing strenuously that the Act should be construed broadly, the Defendants have cited numerous cases which, they insist, support a liberal interpretation of the Act. [28] But, because, simply put, these cases are directly concerned with exploration, production, or drilling, they actually support Transco's position that the contract in question must pertain to a well. It is important to distinguish between broad interpretation within the bounds of the Act and overbroad interpretation that would expand the Act beyond even the broadest of reasonable meanings in an effort to affect contractual provisions that the Legislature did not by the wording employed intend to prohibit.

When Louisiana courts and federal courts sitting in diversity have construed the Act in the context of interstate gas transmission pipelines, they have been less than consistent in their interpretations of the Act's coverage. The federal district court's opinion in *Clarkco Contractors* [29] supports the position we take today. There, the plaintiff was injured in an explosion that occurred while he was working on a gas pipeline owned by the defendant, a natural gas transmission company. The trial court found that the Act did not apply to the contract in question because the contract must pertain to a well for oil, gas or water, or to drilling for minerals. The *Clarkco Contractors* court found that the gas from many wells, co-mingled for transmission, no longer pertained to a well.

The Louisiana Fourth Circuit Court of Appeal decision in *Griffin v. Tenneco Oil*

---

**25.** 615 F.Supp. 775 (M.D.La.1985).

**26.** *Id.* at 781.

**27.** *See Rodrigue v. Legros,* 563 So.2d at 248; Passage quoted at text accompanying footnote 20, *supra.*

**28.** *See Copous v. ODECO Oil & Gas Co.,* 835 F.2d 115 (5th Cir.1988) (contract to renovate living quarters on a stationary production platform); *Nesom v. Chevron USA, Inc.,* 633 F.Supp. 55 (E.D.La.1984) (contract to sand and paint a drilling rig platform); *Fuselier v. Amoco Produc-*

*tion Co.,* 546 So.2d 306 (La.App. 3rd Cir.), *cert. denied* 551 So.2d 630 (La.1989) (contract to perform grass cutting maintenance at a land-based production site); *St. Amant v. Glesby–Marks Corp.,* 532 So.2d 963 (La.App. 5th Cir.1988) (lease contract for a hydrostatic well-testing unit); *Day v. J. Ray McDermott, Inc.,* 492 So.2d 83 (La.App. 1st Cir.1986) (contract to construct an offshore production platform); *Livings v. Service Truck Lines, Inc.,* 467 So.2d 595 (La.App. 3rd Cir.1985) (contract to test inventory drill pipe at the yard).

**29.** 615 F.Supp. 775 (M.D.La.1985).

*Co.*[30] also supports our conclusion. In *Griffin,* suit was filed against Tenneco for injuries the plaintiff sustained in a fire at Tenneco's Chalmette refinery. The Fourth Circuit, citing *Clarkco* with approval, refused to extend applicability of the Act that far because it was persuaded that "the Legislature was obviously concerned about wells and drilling, not about pipeline transportation or refining of oil, and this concern is reflected in the statute."[31]

Still, not all courts have accepted that conclusion. In *Ferguson v. Stingray Pipeline Co.*[32] a federal district court held that the Act applied to a contract for work done on an offshore gas transmission compressor station. The court found that the contract was related to the transmission of gas. Further, the court stated:

> In addition, even if we disagreed ... that the services need not be rendered in connection with a specific well, we would still find that the agreement here "pertains to a well for oil, gas, or water," as required by the Act. Simply put, the gas with which Stingray's platform is involved "pertains to a well."[33]

Perhaps that was too simply put. The court did not explain how it reached the conclusion that the gas "pertains to a well." Interestingly, however, the court distinguished its case from *Clarkco,* because it found that *Stingray* concerned work on an offshore platform while *Clarkco* concerned work on an interstate pipeline.[34]

Although *Murray v. Trunkline Gas Co.*[35] appears at first blush to conflict with our holding, it actually supports our position when fully analyzed. There, the state appellate court considered the applicability of the Act to a contract for welding services on a stationary valving platform that services a natural gas pipeline on the Outer Continental Shelf. The court reasoned that the contract came within the scope of the Act because it concerned the transportation of gas. The *Murray* court did not discuss the statute's requirement that the contract "pertain to a well," but attempted to distinguish *Clarkco Contractors,* a case that appears to be in direct conflict with *Murray.* The *Murray* court contended that *Clarkco Contractors* could be distinguished because it concerned a land based pipeline, whereas

> [i]n the case at bar, the platform is located on the Outer Continental Shelf and *is connected to wells producing hydrocarbons* through Trunkline's pipeline. Further, ... nothing is done to the hydrocarbon until it reaches onshore facilities.[36]

We perceive no acceptable justification for the *Murray* dichotomy of offshore-onshore by reading the Act; there is simply nothing in the Act or the expressed legislative intent on which to base such a distinction. But the alternative basis for the holding in *Murray*—that the contract in question, involving servicing a pipeline used for incidental transportation of gas *directly from a well* before the gas is treated or commingled in any way, does "pertain to a well"—would be consistent with our interpretation and with the most sensible reading of the language of the statute.

In *Cooper v. Offshore Express, Inc.,*[37] a case we affirmed without opinion, the district court considered the plight of a steward injured while serving aboard a stationary pipeline compressor station platform located on the Outer Continental Shelf off the Louisiana coast. The steward was injured when an undermanned boat was negligently docked, ramming the platform. The court found the boat's owner to be entirely responsible for the steward's injuries and exonerated two other defendants,

**30.** 519 So.2d 1194 (La.App. 4th Cir.), *cert. denied,* 521 So.2d 1154 (La.1988).

**31.** *Id.* at 1196.

**32.** 672 F.Supp. 944 (W.D.La.1987).

**33.** *Id.* at 946.

**34.** *Id.*

**35.** 544 So.2d 28 (La.App. 4th Cir.1989).

**36.** *Id.* at 31.

**37.** 717 F.Supp. 1180 (W.D.La.1989), *affd.* 915 F.2d 1569 (5th Cir.1990).

indemnitees under a master service contract and a construction contract.

After concluding that the indemnitees were not at fault, the court stated that the Act "renders unenforceable"[38] the indemnity provisions. It then noted that the Act does not apply when the indemnitees are not negligent or at fault,[39] so the indemnitees could recover costs of defense under their indemnification agreements. Because the indemnification agreements were excepted under these circumstances, the application of the Act was unnecessary, and we are not bound by our affirmance of the district court's decision.

The *amici curiae* urge us to interpret the Act expansively to include contracts, such as the APS/Transco contract, that concern pipelines, because those pipelines provide transportation of natural gas. The *amici curiae* report that their members, who are pipeline contractors, lobbied the legislature heavily for passage of the Act despite pressure from those contractors' customers who were understandably opposed to the Act. While we may sympathize with the contractors' efforts to pass a measure that they believed at the time would safeguard them from "the inequit[ies] foisted on certain contractors and their employees by the defense or indemnity provisions ... contained in some agreements," we cannot accept their position that those efforts auger for overbroad construction of the Act in the form that it was ultimately passed. In the well known give-and-take of legislative lobbying, the pipeline contractors simply failed to get everything they wanted; they got a statutory protection limited in scope to those pipeline contracts for transportation of gas to the extent, but only to the extent, such contracts *pertain to a well.* The expanded coverage desired by *amici curiae* must be sought from the legislature, not from the courts.

Unlike oil, which even offshore is frequently stored temporarily in tanks on the leasehold, natural gas cannot be thus stored. Once natural gas is severed, its flow is continuous from the wellhead to the ultimate consumer, or on rare occasions, to underground storage facilities. True, in highly unusual circumstances, gas must sometimes be suctioned from the earth, and even flowing gas often must be compressed to create enough pressure to carry it effectively through pipelines. In addition, natural gas is not refined in the same sense as is oil, but it does undergo various processes to extract liquid hydrocarbons suspended in the gas, to remove undesirable contents, and otherwise to prepare the gas for ultimate consumption. And unlike oil, these compression and preparation processes do not necessarily occur on the leasehold, in the "oilfield," or even in one particular location. They are frequently separated from the well by many miles.

██ Under these circumstances, to determine whether a contract pertains to a well or to drilling requires a fact intensive case-by-case analysis. Regrettably, such a determination does not lend itself to any overarching bright line standard, so we must decline to attempt to articulate one. Rather, in recognition of the fact that in each situation there should be a reasonably determinable point at which the gas can no longer be identified with a particular well, or is so fundamentally changed in processing, commingling, or preparing it for distribution to its ultimate end user, that the gas no longer "pertains to a well," we are able to discern several factors relevant to the process of determining that point. These include, without limitation,

(1) whether the structures or facilities to which the contract applies or with which it is associated, e.g. production platforms, pipelines, junction platforms, etc., are part of an in-field gas gathering system;

(2) what is the geographical location of the facility or system relative to the well or wells;

(3) whether the structure in question is a pipeline or is closely involved with a pipeline;

---

**38.** 717 F.Supp. at 1187.

**39.** *Id., quoting Meloy v. Conoco, Inc.,* 817 F.2d 275, 280 (5th Cir.1987).

(4) if so, whether that line picks up gas from a single well or a single production platform [40] or instead carries commingled gas originating from different wells or production facilities;

(5) whether the pipeline is a main transmission or trunk line;

(6) what is the location of the facility or structure relative to compressors, regulating stations, processing facilities or the like;

(7) what is the purpose or function of the facility or structure in question;

(8) what if any facilities or processes intervene between the wellhead and the structure or facility in question, e.g., "heater treaters," compressor facilities, separators, gauging installations, treatment plants, etc.;

(9) who owns and operates the facility or structure in question, and who owns and operates the well or wells that produce the gas in question;

(10) and any number of other details affecting the functional and geographic nexus between "a well" and the structure or facility that is the object of the agreement under scrutiny.

■ In the instant case, Transco offered the affidavit of one of its senior superintendents in charge of operations and maintenance. In his affidavit, the superintendent affirmed that:

Neither of the platforms from which APS worked pursuant to the APS/Transco contract were in any way involved in the drilling, production, or servicing of natural gas wells. The gas well which is nearest to either platform is in excess of one mile away.

Both of the platforms on which APS worked were part of Transo's [sic] interstate gas pipeline system. These platforms are junction platforms at which various Transco pipelines intersected each other on their way from the Offshore Louisiana area to the Onshore Lou-

isiana are and then to Transco's customers in states other than Louisiana.

At these platforms, Transco is able to maintain its pipelines in order to avoid corrosion, damage, or blockage.

Transco is an interstate natural gas pipeline company. Transco owns and operates no natural gas or other wells.

Transco's sole connection with any natural gas wells is limited to the following:

(a) Purchasing natural gas from those persons who drilled, produced, and/or operate natural gas wells pursuant to a contract duly entered into; transporting that gas through its pipeline from the well to Transco's customers throughout the Southeastern United States; and selling that gas to Transco's customers or

(b) To receive gas purchased by third parties from the persons who drilled, produced and/or operated the natural gas wells located in the Offshore Louisiana area and to transport that gas, for a fee, to the purchaser of that gas.

This affidavit is the only evidence in the record shedding light on the relationships among Transco's two platforms, the pipelines connected to them, and the wells from which the gas they transport originate. We find the content of this lone affidavit insufficient for us to determine with any degree of certainty whether the APS/Transco contract for painting Transco's platform "pertains to a well" within the intendment of the Act. Therefore, we must return the case to the district court for further factual findings and legal conclusions with respect to this issue. Whether that may be accomplished at the summary judgment stage with additional discovery or submissions, or only with evidence adduced at a trial or other evidentiary proceeding, we leave to the determination of the district court.

### V.

### CONCLUSION

For the reasons set forth in this opinion, the summary judgment of the district court

---

**40.** We are cognizant that certain offshore gas production platforms in fact service many wells that radiate out from the platform at angles, so called directional drilling. We believe that these separate wells, serviced by one offshore drilling platform, constitute but one "well" for the purposes of the Act.

is REVERSED and the case is REMANDED for further proceedings consistent herewith.